THOMAS, *treasurer of the State, vs.* MAHAN & ALS.

In the exposition of a private statute, conferring special privileges, or imposing particular obligations, it is not proper to resort to the language of any other private act, not relating to the same parties and the same subject matter ; such private statute standing upon the same basis with contracts by deed, which are not to be affected by evidence *aliunde.*

The managers of the *Sullivan*-bridge lottery are not liable, under the private statute of 1826 *ch.* 430, *sec.* 3, to pay into the treasury of the State, the price of any tickets, which in the diligent and faithful execution of their trust, they have been unable to sell.

THIS was an action of debt, brought by the Treasurer of State, upon the bond given by the defendants as managers of the *Sullivan*-bridge lottery, pursuant to the private statute of 1826 *ch.* 430. The question at issue was stated in a case agreed by the parties ; and was argued at this term by *Adams* for the plaintiff, and *Orr* and *Greenleaf* for the defendants. The facts appear in the opinion of the court, which was delivered at the succeeding term in this month, in *Kennebec,* by

MELLEN C. J. On the 7th of *March* 1826, the legislature granted a lottery to *John Sargent,* to raise the sum of four thousand dollars, in consideration of expenses incurred by him, in erecting a bridge across an arm of the sea at a place called *Sullivan* ferry, and for finishing and keeping the same in repair ; and by the act above mentioned, authorized the Governor and Council to appoint the managers of said lottery, removable at their pleasure; who, before entering on the duties of their office, were to be sworn to the faithful performance of said duties, and give bond, in the sum of ten thousand dollars, " conditioned for the faithful performance of all the duties of their office," and that they would "at such time, and in the manner by law provided, pay into the treasury of the State the whole proceeds of said lottery, after deducting for their expenses and services such sums as" should "be allowed them by the Governor and Council, not exceeding twenty-five per cent on the sum raised by said

lottery." The defendants were appointed the managers; accepted the trust; and after having been duly sworn, and having given bond as provided by the act, proceeded in the execution of the duties of their appointment; and it appears, from the facts before us, that in so doing, they carefully exercised their best judgment and discretion, and so conducted the business assigned them, as that the council have discovered nothing in their doings, which has induced them in the least degree to doubt their integrity and fidelity in the discharge of their duties. Still it appears that in the prosecution of the business by the managers, while there has been a gain, on the whole, a loss has been sustained on the tickets remaining unsold; and the question is, on whom that loss shall fall; or, to speak with more precision and limitation of language, we state the question in the very words of the counsel, who have signed the statement of facts before us. The words are,—"whether the managers are holden to pay into the treasury of the State the price of every ticket made in each class of said lottery, sold or unsold ; or whether they are holden only for such tickets as, after using due diligence, they may have been able to sell." It will be perceived at once, by the terms in which the question is proposed and submitted, that there may be several questions growing out of a critical examination of the act, and connected with some unforeseen and unexpected consequences in the execution of the powers given to the managers. It may be inquired, who are to bear a loss like the one in the present case, and when will the business of the lottery be completed, if the managers are not by law holden to be liable on their bond for such loss ? Other inquiries might be suggested, which might lead to some difficulties that were never anticipated at the time the act was passed; but with these suggested questions, or doubtful consequences, we have no connexion. One question and one only, is by the parties submitted for our decision ; and that is, whether the managers are obliged, by the condition of their bond, to pay into the State treasury the price of tickets unsold, and which, after using due diligence, they were unable to sell. Leaving all other questions, and the consequences to which they may lead, untouched, it will be understood, that our decision is confined to the single question stated by the parties.

Thomas *v.* Mahan & als.

The defendants are presented to our view as public agents, clothed with certain powers, and under obligation to execute those powers with honesty and faithfulness, as well to the State, as to all persons interested in the lottery. To this extent the managers would have been bound upon the principles of morality and justice, independently of the condition of the bond on which this action is founded. Does this condition, upon a fair construction of it, go beyond such obligation, and subject them to additional *liabilities* and duties ? In other words, does the act granting the lottery, impose the risk of its productiveness upon *Sargent*, to whom and for whose benefit it was granted ; or does the act impose that risk upon the managers, who are regarded by it as merely disinterested public agents ? If the risk is imposed on the managers, then it will result, that the fewer tickets in a class they are able to sell, the more certainly productive will be the lottery to *Sargent*, though it may be ruinous in its consequences to the upright and faithful agent. Before attempting to answer these questions by a careful examination of the several provisions of the act, it is proper to ascertain and decide, whether we are at liberty to travel out of the condition of the bond, and beyond the provisions of the act to which it refers, for a description of the duties of the managers, to obtain aid in arriving at a true construction of their import and intention ; because it has been contended in the argument that the act of *February* 11, 1823, authorising a lottery for the benefit of the Cumberland and Oxford Canal corporation, contains provisions more liberal in favor of the managers of that lottery, than are contained in the act of *March* 1826, which we are now considering ; and hence it has been argued that the difference of phraseology in this latter act, is proof that a more strict, and a deeper accountability was intended on the part of the managers of this lottery, than in the Canal lottery. We might at once reply to this argument by saying, that as the Canal lottery is a private or special act, and is not presented to our consideration in the statement of facts, it is no part of our duty to take judicial notice of it ; but when the cause was argued, we listened to all the reasons, which the counsel on both sides thought proper to urge, as well in relation to the

Canal lottery act, as to the *Sullivan*-bridge lottery act ; still, in the decision of the cause, it is a question of law, not of courtesy or expedience, how far we are authorised to seek the true construction of the latter act, by comparing its language and provisions with those of the former. It is unquestionably a correct principle, that public statutes, made *in pari materia*, should be construed as though their several provisions were embraced in one act ; or that one act may be explained and construed, by comparison with another ; all having a general relation to the same subject matter. It is at least doubtful, even in the construction of public statutes, whether the principle before stated can in any case be admitted, where they relate and extend to subjects distinct and independent of each other, which have been the occasion of legislation at successive periods. Be this as it may, there is a manifest distinction between a public statute, which is of universal concernment and obligation, and prescribes a rule of action to all, and a grant by the legislature, or a private act, granting certain chartered privileges to individuals ; or to be executed by persons appointed for the purpose, and under bond for their fidelity. The former is the declaration of the sovereign will; and when constitutionally proclaimed, it becomes binding on all the citizens, without any subsequent assent on their part, expressed or implied. But such is not the effect of a grant or charter of privileges to individuals, or of any private act to be executed in the manner before mentioned. Such an act, though passed with all constitutional sanctions, possesses no binding force, even on the grantees of such chartered privileges, unless expressly or by implication accepted by them; or on those appointed to carry its provisions into execution, until they have accepted the appointment, and subjected themselves to a legal obligation to perform the duties it imposes. Then, and not othererwise, is it in effectual operation. And why is it not? Simply because such an act is in the nature of a contract, to the perfection of which the assent of two or more minds is always necessary. Can an individual, when he receives a grant from the legislature, or when a private act is passed for his benefit, be bound to look into and carefully examine the language of other grants and private acts, in order to ascertain the true meaning

of the grant or act made for his own benefit ? This question seems to be one of easy solution. If in the present instance the condition of the bond had contained a distinct recital of the several duties to be performed by the defendants in their character of managers, without any reference to the act granting the lottery, it would then present the common case of a contract by deed between two parties, in which evidence *aliunde* could not be admitted to limit or extend the condition, or in any manner be brought in aid of its construction. And can it make any difference in principle, whether the condition contains this distinct recital of duties, or describes those duties by reference to the act in question in which they are distinctly stated ? *Id certum est quod certum reddi potest.* The bond refers to no other act ; and hence we are not at liberty to refer to any other. The same principle must exclude proof *aliunde* in both cases ; for both are cases of contract, and in both the condition is the same. In the case at bar, the act itself, so far as it describes the duties and liabilities of the defendants, is a part of the condition, and of course being a private act or grant, it must be construed by a careful examination of its language, and by no other mode. Contracts may be varied, *ad infinitum*; and the true rule to be applied in their construction, is, as far as can be done, to ascertain the fair and honest intention of the parties, without affixing to words or expressions any other than the meaning which they ordinarily bear. This is the general principle, and by this the act in question must be tested. We therefore lay out of the case the act granting the Canal lottery, as furnishing no rule of construction in the case at bar. We are not at liberty to ascertain the meaning of the bond before us, and the act to which it has exclusive reference, but by resorting to the provisions of the act itself.

Our next inquiry is what those provisions are.—We will state the import of them all ; though many of them have no bearing upon the question under our immediate consideration.—We have arranged them, as nearly as we could, in their natural order.—1. The managers are to publish in a certain way the scheme of each class, the time of drawing, and the list of prizes.—2, They shall keep a book containing an account of their doings relating to

each class, and exhibit it to the Governor and Council at their first session after each class is drawn, and file a transcript of it in the treasurer's office.—3, They may deduct the amount of six per cent on tickets sold for the purpose of resale.—4, They shall pay all prizes drawn in any class, on demand, after sixty days next after the completion of the drawing of such class.—5. They shall, within sixty days after the drawing of each class is completed, pay into the treasury the whole proceeds of such class, deducting the sum allowed them for services and expenses.—6. "And said managers shall be holden to account for all the tickets in every class in said lottery; and all prizes not claimed within one year as aforesaid." 7. When the whole business of the lottery shall be completed, the managers shall make up and present to the Governor and Council a fair account of their whole proceedings.—The controverted question in the cause, originates in the sixth provision, which we have quoted above in the words of the act; and the decision of the present action depends upon its construction. The counsel for the plaintiff contends, that the defendants stand accountable to the public treasury for the price of all the tickets in each class, whether sold or unsold, after deducting expenses and certain allowances made to them by the Governor and Council; and that as they did not sell all the tickets, they must by law be held answerable for those which remained unsold, at their established price, and assume the risk of their drawing blanks, in the same manner as though they had expressly appropriated them to their own use, considering themselves in the light of purchasers. This certainly seems to be a harsh principle, to be applied to a public agent who has been faithful and honest; and its application should be justified and required by language clear and unequivocal. But can it be correct to give to doubtful expressions a construction that shall lead to such serious consequences? The very design, in appointing managers of a lottery, is to guard the interests of all concerned; and to inspire confidence, on the part of the community, in the fairness and correctness of all proceedings in relation to it. Hence the importance of keeping this object in view, and as far as possible, of effecting this design. Now it is worthy of dis-

tinct observation, that the construction contended for by the plaintiff's counsel, has a tendency, in its principle, to expose the managers to temptation ; and if they were not honest men, to expose others to losses occasioned by a species of management which could with ease be rendered secure from detection. For if the managers of this lottery, or of any other, granted by an act, containing similar provisions, are at all events holden to pay for all the tickets in each class remaining unsold, and to consider themselves as the purchasers of such tickets, strong inducements are at once placed before them, so to arrange the machinery of the lottery, or the process to be observed in drawing it, as to secure to themselves as many of the highest prizes as possible, and even the highest. In estimating the power of this temptation, and its probable influence and effect, and applying it in the construction of the act in question, we must not make the application to the defendants in particular, but to men in general as they are ; and test it by our own knowledge of human nature.— On the other hand, when the tickets unsold are considered as appropriated for the use of the lottery, this temptation is removed, and the danger avoided. As we have before observed, the plaintiff's claim to maintain this action reposes on these words in the act, viz. " and said managers shall be holden to account for all the tickets in every class in said lottery ; and all prizes not claimed within one year." By a provision in the third section of the act, such unclaimed prizes become a part of the proceeds of the lottery ; and by the second section, they are expressly bound to pay the whole proceeds into the state treasury ; so that their supposed liability for the amount of the established price of unsold tickets, depends entirely on the words, " holden to account for." In those provisions of the act, which we have distinguished as the fourth and fifth, the word " pay" is used ; now unless the legislature intended a different kind of liability for unsold tickets, why did they not use the same word again, and declare that the managers should be holden to pay for all the tickets, in each class ? and why are there so many regulations as to accounts to be rendered in a particular form, if the managers are liable, from the moment a scheme is made, to pay for all the tickets in the

class ?—The expression " holden to account for," means, not merely to " render an account of," but, " to be responsible for;" it stands in opposition to the right of appropriation to one's own use and benefit.—In common cases of principal and agent, the expression would as well be satisfied by an honest return of that part of the principal's goods, which the agent could not sell, as by a payment of their proceeds in case he had sold them ; such is the common understanding of language thus used. But we may go further. Some of the provisions in the fourth section of the act, (and which we have numbered as the second provision,) seem very distinctly to show the correctness of our construction. The words are (speaking of the duty of the managers,) " and shall keep a book, in which they shall charge themselves with the amount received for each ticket in every class in said lottery, numbering the same ; and of prizes not claimed within one year : and they shall credit themselves with the amount of the prizes paid to the purchasers of tickets." These three items compose the whole account to be rendered to the Governor and Council. There are but two subjects of charge ; and one of credit. The provisions above quoted proceed upon the idea that the tickets have been sold ; otherwise we cannot perceive the meaning of the expression, " the amount received for each ticket " According to the doctrine contended for by the plaintiff's counsel, the managers ought to charge themselves, at once, with all the tickets in each class, at the established price. Again, if they are liable for all the tickets sold or unsold, what is the use of the words " numbering the same ?" Was it not that the Governor and Council might know the success of the managers in the sale of tickets in each class ? We might proceed further in this investigation, but we do not deem it necessary. Being satisfied with the construction we have given to the act before us, it remains to apply the principles thus stated to the facts agreed by the parties. The managers used due diligence, but in the careful exercise of their best discretion, they were unable to dispose of all the tickets in the first or second class of the lottery. Then they were in no fault thus far. In the next place, it appears, that they were not disposed to consider the

unsold tickets as their own, or to take any risk on themselves in respect to them ; these tickets, therefore, were distinctly set apart and sealed up and preserved, at the risk, and for the bene-fit, of the lottery.   The prizes drawn against any of these num-bers are fairly credited to the state ; and in this manner justice seems to have been done.   Had there not been this distinct appropriation of the unsold tickets to and for the use of the lot-tery, other questions might have been made.   So also there might have been in case the managers had been unfaithful or dishonest ; but we have nothing to do in this cause, but decide the question submitted to us; leaving supposable facts and unfore-seen consequences to be examined elsewhere.   The court are unanimous in the opinion that, on the facts agreed, the action cannot be maintained.                         *Plaintiffs nonsuit.*