## PORT OF SEATTLE v. FIDELITY & DE-POSIT CO. OF MARYLAND.

### No. 21038.

District Court, W. D. Washington, N. D.
July 27, 1938.

G. W. Hamilton, Atty. Gen., L. C. Brodbeck, Asst. Atty. Gen., and Fairbrook & Williams, of Seattle, Wash., for plaintiff.

Grinstead, Laube & Laughlin and Arthur Grunbaum, all of Seattle, Wash., for defendant.

BOWEN, District Judge.

The original bond dated February 21, 1922, was conditioned to save the Port harmless from any and all loss which it might sustain by reason of (1) failure of the employee to faithfully perform the duties required of him by the Commissioners; (2) failure of the employee to account for all funds which might come into his possession belonging to the Port; and (3) a fraudulent or unlawful deed committed by the employee. That original bond

had attached to it on its effective date a schedule bonding Gormley in the sum of $20,000.

Another condition of that bond was that "this insurance on any employee may be increased or decreased by the surety without impairing the continuity thereof, provided that the surety's aggregate liability under all its bonds and engagements, on any one employee, shall not exceed the largest bond or engagement on such employee". This provision is referred to as the "aggregate liability clause".

On April 30, 1934, which was 8 days prior to the discovery of loss by the Port and the failure of Gormley to account therefor, there was attached to the original bond and made retroactive to April 1, 1934, a new schedule which increased the coverage on Gormley from $20,000 to $50,000. This new schedule contained a stipulation, to the same effect as that in the original bond, that continuity of protection under the original bond should not be impaired by the conditions of the $50,000 schedule, but provided that defaults under the different schedules should not be cumulative.

Plaintiff contends that under the provisions of the bond and schedule in effect at the time of the failure of Gormley to account on May 8, 1934, defendant is, in respect to funds for which Gormley did not on that date finally account, liable for the full amount of the $50,000 coverage in effect on that date under the "account for all funds" condition of the bond, whether or not the funds were embezzled by Gormley and lost to the Port before or after April 1, 1934, the effective date of the $50,000 schedule.

The defendant, however, contends in effect that the bond is nothing more than an embezzlement bond; that the "account for all funds" provision does not of itself constitute an obligation on the surety to pay; that the original bond and $20,000 schedule on the one hand, and the original bond and $50,000 schedule on the other hand, so far as fixing the time and amount of the surety's obligation is concerned, constitute separate contracts and that plaintiff cannot recover more than $20,000 for any embezzlement or loss actually sustained during the coverage of the $20,000 schedule; that plaintiff has failed to prove what specific sums, if any, Gormley embezzled after the effective date of the $50,000 schedule; that by reason thereof plaintiff should not be allowed any recovery on ac-

count of the $50,000 schedule; and that in no event should plaintiff recover in respect of the $50,000 schedule any sums other than those actually embezzled after the effective date of that schedule.

Most (in fact all except relatively small sums the exact amount of which is greatly in doubt) of Gormley's peculations in Port funds occurred before the effective date of the $50,000 schedule. Both sides agree that the total amount of Gormley's embezzlements during the periods of coverage under both the $20,000 and the $50,000 schedules far exceeded the maximum coverage under the $50,000 schedule.

The question, therefore, is whether the surety is liable, up to the maximum amount of the $50,000 schedule under the "account for all funds" provision, for all the funds lost to the Port by Gormley's defalcations occurring during the period from the effective date of the original bond to the date when Gormley finally failed to account. That question involves the meaning of the term "account for" and the further determination of whether the obligation to "account for" was an obligation continuing until Gormley finally failed to account for and pay over the Port funds.

What then is the meaning of the condition "to account for all funds * * * which may come into his possession belonging to the Port"? Does it mean merely an obligation to make up a formal statement of account or to advise or explain what became of such funds, and, if they were embezzled or lost, who benefited? Or does that condition of the bond obligate the surety in case the employee fails to pay over such funds even though the employee may have made a statement explaining what became of them? This "account for all funds" provision must have been intended to afford some other or different protection, in addition to the two other bond conditions as to unlawful deeds and faithful performance of duty; otherwise it would be difficult to assign any reason for the "account for all funds" provision.

In U. S. v. Rehwald, D. C., 44 F.2d 663, a criminal proceeding charged the defendant with failing to account for farm products under a criminal statute making it a misdemeanor to "fail truly and correctly to account therefor". The defendant received the products and rendered an account of receipts and sales but did not remit the proceeds. The court said, at

page 663: "The term 'account for' has been in various state adjudications interpreted to mean paying over the money to the person entitled thereto. See State ex rel. McKown v. Williams, 77 Mo. 463, Cushman v. Richards, 100 Mass. 232. And in Thomas v. Mahan, 4 Me. 513, 4 Greenl. 513, the court said: 'The expression "holden to account for" means, not merely to "render an account of," but, "to be responsible for;" it stands in opposition to the right of appropriation to one's own use and benefit.' "

In Moody v. Pacific Surety Co., 41 Cal. App. 287, 182 P. 802, there was involved an administrator's bond to "faithfully execute the duties of the trust according to law" and a complaint that the administrator had never accounted for the money, and the court there said: "The phrase 'to account for' means more than the mere filing of a paper statement of account which is referred to as an exhibit in the preceding section. In State ex rel. McKown v. Williams, 77 Mo. 463, the contention was made that the condition of a guardian's bond 'that he would well and truly account for' the moneys received by him, was satisfied when the guardian charged himself with the ward's money in the annual settlement. And, as in the instant case, the breach assigned in the petition was the failure 'to account for' the moneys of the estate. But the court (77 Mo. page 471) said: 'This is not all that is embraced in this term "account for." It is a condition not satisfied short of paying over the trust fund to the cestui que trust.' "

In Cushman v. Richards, 100 Mass. 232, construing a contract for the purchase of stock in a bank owning a mortgage of uncertain value, in which contract the purchaser agreed to account to the seller for one-half of the avails of the mortgage, the court said: "There can be no doubt that this contract imports an obligation to pay, and that this is included in the phrase 'to account.' "

■ The condition "to account for all funds" in the bond in suit means, therefore, to pay over the funds as well as to render a statement of account for them, and that condition is not fully complied with until the funds are actually paid to the Port of Seattle.

■ As to whether the obligation "to account for all funds" runs continuously during all the period from the date of the original bond to the date of Gormley's final failure to account and pay over the money, it is significant that Gormley was employed for no definite term and was dischargeable at will, and that neither the original bond itself nor the $50,000 schedule contained any provision limiting coverage to any definite period, but the original bond did provide for its termination as to any employee upon the giving of specified notices. Both the original bond and $50,000 schedule provided for increasing or decreasing the amount of insurance on any employee without impairing the continuity of insurance, provided that the surety's liability for the different periods covered by different amounts should not be cumulative as to any employee. That situation was not materially affected, at least not for the surety's benefit, by anything done by the parties after the execution of the original bond and before the effective date of the $50,000 schedule. It must be concluded that the continuity of coverage continued after its inception down to the time when Gormley failed finally to account.

In the case of Bromen v. O'Connell, 185 Minn. 409, 241 N.W. 54, 82 A.L.R. 583, the surety on a later guardian's bond was held liable for defalcations of the guardian occurring during a period of time covered by an earlier bond, where the later bond was by statutory requirement conditioned for the faithful discharge of the guardian's duties according to law, and one of his duties under the law was to render a faithful accounting at the end of his trust. In that case the court distinguished bonds of public officers elected for a definite term or for successive terms, because (185 Minn. p. 411, 241 N.W. page 55, 82 A.L.R. 583)

"At the end of each term of a public officer there is usually, under the law, and in any event ought to be, a definite cut-off and audit marking the end of the old term and liquidating the incumbent's liabilities resulting from that term. That he succeeds himself is a mere circumstance, wholly irrelevant to the legal transition from old to new that takes place. There is just as definite an end of one stewardship and the beginning of a new as though he were succeeded by another rather than himself. The nature and limits of his stated term and the fact that any official wrongdoing affects only affairs of the current term distinguishes the status of a public officer from that of a fiduciary, such as a guardian. The latter does not serve for

a fixed term. *His duty is continuous from beginning to end of his trust.*

"Such is the logic of the rule, supported by facts and harmonizing with the legal concept of successive official liabilities, which exempts sureties for a later from liability for defalcations of an earlier official term. Its justifying basis does not exist in the case of sureties for guardians or similar fiduciaries. They serve for but one term, whereas a public officer who succeeds himself serves for successive terms. The duties of the one are unitary and continuous, those of the other divided into successive and definite periods. * * *

"Under bonds of the tenor of the one we are now considering, the sureties are held liable for the failure of their principal to account, even though the initial wrongdoing antedates the bond. The resulting duty to make good the loss continues to the end. [Citing cases] * * * Of course, in the absence of apt language requiring it, fiduciary bonds are not given retrospective operation. We do not so apply the bond now in question. We simply apply the statutory language to the accomplishment of its plain purpose, which is to assure the performance of the guardian's future duty finally and faithfully to account for the moneys due from him as guardian. It is as to the breach of duty after the giving of the bond that we enforce its obligation. There was, subsequent to the bond, a malfeasance covered by it, a failure faithfully to discharge 'the duties of his trust according to law,' with resulting damage * * *."

The rule of the Bromen Case, supra, is applicable to the facts in the case at bar. It seems clear that by the terms and plain meaning of the bond and schedule in suit the surety intended to and did issue the bond of February 21, 1922, and its $50,000 schedule effective April 1, 1934, to save the Port harmless until Gormley finally accounted to the Port for all funds of the Port coming into Gormley's hands and that such obligation of the surety should continue as on one and the same contract (although by the $50,000 schedule for an increased amount) so long as the surety remained obligated on the bond and schedule. Park Falls State Bank v. Fidelity & Deposit Co., 206 Wis. 413, 240 N.W. 154. The surety was so obligated under the bond and $50,000 schedule on May 8, 1934, when Gormley finally failed to account for the funds which he had theretofore failed to account for, and the surety is bound by the terms of its contract, consisting of the original bond and $50,000 schedule, to save the Port harmless in respect to such funds as Gormley so finally failed to account for to the extent of $50,000.

And in view of the foregoing authorities and the terms and conditions of the bond and schedule, that obligation of the surety under the "account for all funds" provision was not that of merely an embezzlement bond and nothing more, and was not discharged because most if not all of the money was embezzled before April 1, 1934, nor was such discharge effected by Gormley's statement advising of his disposition of the Port's money, but such obligation remains in full force and effect so long, during the life of the bond and schedule, as Gormley fails to finally account for and pay over that money to the Port.

Other authorities not herein mentioned have been cited by counsel, but they are not by the court considered as nearly in point as those above specifically referred to; and other contentions have been earnestly advanced and considered, but they are not deemed well taken.

The plaintiff Port of Seattle is, therefore, entitled to judgment against the defendant surety company as prayed for. Findings, conclusions and judgment may be settled upon notice or stipulation.