NEW JERSEY BANK (NATIONAL ASSOCIATION), A COR-
PORATION OF THE UNITED STATES OF AMERICA,
PLAINTIFF-APPELLANT, v. JOSEPH P. PALLADINO, DE-
FENDANT, AND FIRST STATE BANK OF HUDSON
COUNTY, DEFENDANT-RESPONDENT, AND FEDERAL
DEPOSIT INSURANCE CORP., INTERVENOR-RESPON-
DENT.

Argued February 22, 1978—Decided July 10, 1978.

34

*Mr. Allan A. Maki* argued the cause for appellant.

*Ms. Dorothea O'C.Wefing* argued the cause for intervenor-respondent (*Messrs. Schumann, Hession, Kennelly* and *Dorment,* attorneys).

No appearance was made on behalf of respondent First State Bank of Hudson County.

The opinion of the court was delivered by

SCHREIBER, J. This case involves the effect of a written assurance given by defendant First State Bank of Hudson County to plaintiff New Jersey Bank to induce it to loan Joseph P. Palladino $50,000. The document stated that if Palladino did not repay the $50,000 debt, which was evidenced by a note, defendant bank would honor that commitment. The crucial question is whether that paper was an illegal guaranty or a valid letter of credit.

The facts are essentially undisputed. In July 1972, Joseph P. Palladino sought a $100,000 loan from plaintiff New Jersey Bank. Plaintiff's Senior Vice-President and Senior Lending Officer, Everett B. Muh, after reviewing Palladino's financial statement, indicated a willingness to advance the money for 90 days but wanted "some sort of collateral or support for the note." In response Palladino obtained a letter from defendant bank signed by its President, Edward Dooley, which read as follows:

Dear Mr. Muh:

This letter will serve as a commitment to you that the First State Bank of Hudson County will assume the obligation arising from a note signed by Mr. Joseph P. Palladino on July 6, 1972, in the amount of $100,000.

We will honor this commitment, 90 days after the date of the note, upon notice to us that the loan has not been paid by Mr. Joseph P. Palladino.

Thereupon Palladino executed a 90-day note and plaintiff bank advanced $100,000.

Palladino deposited the $100,000 proceeds together with an additional $25,000 in his checking account with defend-

ant bank. Of these funds $5,790 were used to satisfy an overdraft on the account and $28,000 were applied to a reduction of Palladino's personal loan of $60,000 from defendant bank. At the time, Palladino was an officer or party in interest of Surf Realty Company, which was also indebted to defendant bank. The sum of $23,850 was transferred from Palladino's account to that of Surf Realty Company.

When Palladino did not repay the $100,000 loan, Mr. Muh in a letter dated October 6, 1972, called upon defendant bank to pay the $100,000 loan plus accrued interest of $2,020.80. President Dooley of defendant bank telephoned Mr. Muh and asked if plaintiff would accept a $50,000 reduction in the indebtedness and renew the note for the $50,000 balance. Mr. Muh accepted "with the understanding that Mr. Dooley would send me another letter covering the $50,000, and he agreed to do this."

Defendant delivered a letter to plaintiff reading:

This letter will serve as a commitment to you that the First State Bank of Hudson County will assume the obligations arising from a note signed by Mr. Joseph P. Palladino on October 12, 1972 in the amount of $50,000.

We will honor this commitment six (6) months after the date of the note upon notice to us that the loan has not been paid by Mr. Joseph P. Palladino.

Relying upon the letter and the $50,000 reduction in the principal indebtedness, plaintiff renewed the loan upon Palladino's executing a new note for $50,000. The note contained provisions requiring the maker, in the event of default, to pay all costs and expenses of collection including attorney's fees of 15% of the amount due.

When the loan was renewed in October 1972, defendant bank's capital funds were $1,776,540. At that time, Palladino and Surf Realty Company owed defendant $32,000 and $125,000, respectively. Palbro Realty Co., in which Palladino had a substantial interest, was also indebted then to defendant in the amount of $130,162.

Palladino paid the interest due plaintiff each quarter on the $50,000 note until February 15, 1974, when the loan fell into default. None of the principal had been repaid. At the time of the trial on November 6, 1975, $7,762 of interest had accumulated.

Plaintiff New Jersey Bank sued both Palladino and defendant, First State Bank of Hudson County, which cross-claimed against Palladino. Palladino defaulted.

. The trial court found it difficult to accept defendant bank's disclaimer of any liability when it gained the benefit from these loans "by the reduction of the outstanding loans shown on * * * [its] own records of Palladino and of Surf Realty Company * * *. The purpose in getting that loan was to assist in the reduction of a problem line" of defendant bank. The trial court concluded that the $100,000 loaned by plaintiff in July 1972 had been deposited in Palladino's account in defendant bank and that these funds had been used to cure an overdraft of $5,790, to reduce Palladino's personal liability to the bank from $60,000 to $32,000, and to amortize the Surf Realty Company's indebtedness (an entity in which Palladino was an officer in interest) to defendant bank by $23,850. The trial court held that defendant's letter dated October 11, 1972 was a letter of guaranty, that the guaranty was a binding contract, and that any violation of banking statutes or regulations could not shield the bank from its obligations to plaintiff, which had relied upon defendant's affirmative contractual offer. Judgments were entered against defendant bank for $65,595 and on behalf of defendant bank against Palladino in the same amount.

The Appellate Division's reversal was grounded on the finding that the letter was a guaranty and was therefore illegal under *N. J. S. A.* 17:9A–213.1, which prohibits banks from guaranteeing obligations of others. 146 *N. J. Super.* 6, 13 (App. Div. 1976). The Appellate Division also held that the defendant bank's letters were not letters of credit within the contemplation of the Uniform Commercial Code, *N. J.*

*S. A.* 12A:5–101 *et seq.,* or of the Banking Act, *N. J. S. A.* 17:9A–25(3). 146 *N. J. Super.* at 12. It also reasoned that even if the letter of October 11, 1972 were a letter of credit, it would have violated the requirement in *N. J. S. A.* 17:9A–25(3) that the duration of such guaranties be limited to one year. However, it found that defendant had obtained a benefit to the extent of $8,790 (that part of the proceeds loaned by plaintiff bank which was used to reduce Palladino's personal indebtedness to defendant) and modified the judgment accordingly. 146 *N. J. Super.* at 13–14. We granted plaintiff's petition for certification. 74 *N. J.* 286 (1977).

▐ Although state banks[1] generally do not have the power to guarantee the obligations of others, the prohibition is not an absolute one.[2] Section 213.1 of the Banking Act of 1948 reads:

*Except as in this act or otherwise by law provided,* no bank or savings bank shall have power to guarantee the obligations of others; * * *. [*N. J. S. A.* 17:9A–213.1 (emphasis supplied)]

An exception is found in that provision of the Banking Act which expressly endows banks with the power, whether or not specifically set forth in their certificates of incorporation,

to issue letters of credit authorizing holders thereof to draw drafts upon it or upon its correspondents at sight or on time not exceeding one year; to guarantee, for a period not exceeding one year from the date of such guarantee, the payment by its customers of amounts due or to become due upon the purchase by such customers of real or personal property. [*N. J. S. A.* 17:9A–25(3)]

---

[1]Our reference to banks is to those state institutions defined as such in the Banking Act of 1948. *N. J. S. A.* 17:9A–1 and –2.

[2]There are several exceptions to the prohibition in the Banking Act of 1948, such as *N. J. S. A.* 17:9A–24(2) and *N. J. S. A.* 17:9A–25.5(7). One court has recently construed the bank's right to exercise incidental powers to include a bank's liability arising out of guaranties of leasing agreements which the bank had sold. *Federal Deposit Ins. Corp. v. Pioneer State Bank,* 155 *N. J. Super.* 381 (Law Div. 1977).

Chapter 5 of the Uniform Commercial Code is devoted to letters of credit. *N. J. S. A.* 12A:5–101 *et seq.* As stated therein, the chapter applies "to a credit issued by a bank if the credit requires a documentary draft or a documentary demand for payment." *N. J. S. A.* 12A:5–102(1) (a). A letter of credit is defined as "an engagement by a bank or other person made at the request of a customer * * * that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit. A credit may be either revocable or irrevocable. The engagement may be either an agreement to honor or a statement that the bank or other person is authorized to honor." *N. J. S. A.* 12A:5–103(1) (a). A documentary demand for payment is one "honor of which is conditioned upon the presentation of a document or documents." Document means "any paper including * * * notice of default and the like." *N. J. S. A.* 12A:5–103 (1) (b).

These sections make it clear that generally a bank's agreement to honor written demands for payment at the request of another upon compliance with specified conditions constitutes a letter of credit. That such was the intent of the drafters of the Code is apparent from the official comments which state that "whenever the promise [of a bank] to honor is conditioned on presentation of any piece of paper, the transaction is within [Article 5]." *N. J. S. A.* 12A:5–102, U. C. C. Comment, ¶ 1. The comments also note that the definitional provisions of a letter of credit "[set] forth the requirement that the engagement of the bank or other person to honor drafts or other demands for payment be at the request of another and involve a transaction falling within the scope of this Article." *N. J. S. A.* 12A:5–103, U. C. C. Comment, ¶ 1. The comments continue by stating that the "engagement" may be by "way of agreement, that is, a promise to honor, or by way of an authority to honor, thus including within the definition of letter of credit, papers called 'authorities to purchase or pay.'" *Id.* The letter of

credit is a contract under which the bank promises to pay someone on demand upon presentation of whatever documents may be required by the letter. *N. J. S. A.* 12A:5–114(1); *Second Nat'l Bank v. Columbia Trust Co.,* 288 F. 17, 20 (3d Cir. 1923).

Historically, the letter of credit was developed to facilitate the sale of goods between distant and unfamiliar buyers and sellers. It was an arrangement under which a bank, whose credit was acceptable to a seller, would at the instance of the buyer agree to pay drafts drawn on it by the seller, provided that certain documents, such as a bill of lading, accompanied the draft. See, *e. g.,* Comment, "Recent Extensions in the Use of Commercial Letters of Credit," 66 *Yale L. J.* 902, 903 (1957).

Expansion in the use of the letter of credit was a natural development in commercial banking. Elasticity in its use was made possible by the broad concept expressed in Article 5 of the Uniform Commercial Code, *N. J. S. A.* 12A:5–101 *et seq.,* so that the letter was readily adaptable to embrace a new commercial banking practice which utilizes what is known as a standby letter of credit.[3] See Jackson and Peters, "Quest for Uncertainty: A Proposal for Flexible Resolution of Inherent Conflicts Between Article 2 and Article 9 of the Uniform Commercial Code," 87 *Yale L. J.* 907, 908 (1978). This usage of a letter of credit is akin to a guaranty, for the bank's sole function is to act as surety for its customer's failure to pay. See Verkuil, "Bank Solvency and Guaranty Letters of Credit," 25 *Stan. L. Rev.* 716, 725 (1973); Arnold and Bransilver, "The Standby Letter of Credit—The Controversy Continues," 10 *U. C. C. L. J.* 272, 278 (1978).

---

[3] H. Harfield has written that Article 5 "would stimulate the domestic use of the letter of credit and, like other potent fertilizers, bring it to instant luxuriance and fruition." Harfield, "The Increasing Domestic Use of the Letter of Credit," 4 *U. C. C. L. J.* 251 (1972).

 The standby letter of credit remains a primary obligation triggered by presentation of documentation as a precondition to payment. The bank which has issued the letter needs only to determine whether the document presented appears on its face to be in accordance with the terms and conditions of the credit. *N. J. S. A.* 12A:5–114. Its responsibility to honor the credit exists independently of the underlying obligation, even though the responsibility may be conditioned on notice of a breach of that underlying obligation. *Chase Manhattan Bank v. Equibank,* 550 *F.* 2d 882 (3d Cir. 1977). See *Barclays Bank D. C. O. v. Mercantile Nat'l Bank,* 481 *F.* 2d 1224 (5th Cir. 1973), *cert.* den. 414 *U. S.* 1139, 94 *S. Ct.* 888, 39 *L. Ed.* 2d 96 (1974) (letter of credit to assure a lender of repayment of applicant's indebtedness) ; *Prudential Ins. Co. v. Marquette Nat'l Bank,* 419 *F. Supp.* 734 (D. Minn. 1976) (letter of credit to assure lender of a commitment standby fee). See also Arnold and Bransilver, *supra,* 10 *U. C. C. L. J.* at 279–280 ; Verkuil, *supra,* 25 *Stan. L. Rev.* at 725. It is now well established that the issuance of a "standby letter of credit is a legitimate use by a bank of its credit, and not an unauthorized excursion by banks into the business of suretyship." Arnold and Bransilver, *supra,* 10 *U. C. C. L. J.* at 282.

The Department of Banking has formally acknowledged the propriety of standby letters of credit in its regulations.[4] *N. J. A. C.* 3:11–9.1 defines a standby letter of credit as follows:

---

[4]Regulation H of the Federal Reserve System defines a standby letter of credit as "an obligation to the beneficiary on the part of the issuer (i) to repay money borrowed by or advanced to or for the account of the account party or (ii) to make payment on account of any evidence of indebtedness undertaken by the account party, or (iii) to make payment on account of any default by the account party in the performance of an obligation." (footnote omitted). 12 *C. F. R.* § 208.8(d)(1) (1977) (footnote omitted). The Comptroller of the Currency and the F. D. I. O. have similar definitions. See 12 *C. F. R.* § 7.1160(a) (1977) and 12 *C. F. R.* § 337.2(a) (1977), respectively.

(a) A standby letter of credit is any letter of credit, or similar arrangement however named or described, which represents an obligation to the beneficiary on the part of the issuer:

1. To repay money borrowed by or advanced to or for the account of the account party; or

2. To make payment on account of any indebtedness undertaken by the account party; or

3. To make payment on account of any default by the account party in the performance of an obligation.

(b) As defined in subsection (a) of this section, the term "standby letter of credit" does not include commercial or traveler's letter of credit issued pursuant to section 25(3) of the Banking Act of 1948, such as:

1. Letter of credit used to facilitate the purchase and sale of goods;

2. Where the issuing bank has obtained, or will obtain, documents of title covering the goods; or

3. Where the credit is reasonably related to the actual value of the goods at the time of purchase and sale.

Substantial authority exists for holding that commitments constituting standby letters of credit are valid under the Uniform Commercial Code. In *Chase Manhattan Bank v. Equibank, supra,* defendant bank issued a letter of credit in favor of the plaintiff bank, which had agreed to finance construction of a motel by Air-North Associates. The letter of credit provided that the defendant bank would make payment upon "certification from [plaintiff] that Air-North Associates has defaulted and which default has not been cured * * *." 550 *F.* 2d at 884. The document was held to be a valid letter of credit under Article 5 of the Uniform Commercial Code.

In *Brummer v. Bankers Trust of South Carolina,* 231 *S. E.* 2d 298 (Sup. Ct. S. C. 1977), defendant bank wrote a letter of credit covering a standby fee required before the plaintiff would commit itself to loan funds to the Phillips Development Corporation. The letter stated that "[t]he amount of this credit [referring to the standby fee of $17,500] is available to you against presentation of your signed statement that you incurred liability due to the failure of Phillips Development Corporation to deliver in

accordance with * * * the contract * * *." *Id.* at 299, n. 1. Holding that upon demand for payment the defendant incurred a legal obligation to honor the demand, the South Carolina Supreme Court concluded the document constituted a valid letter of credit under the Code. *Id.* at 299–300.

In *Dovenmuehle, Inc. v. East Bank,* 563 *P.* 2d 24 (Ct. App. Col. 1977), defendant bank on behalf of two individuals seeking a construction loan issued a letter of credit in favor of plaintiff lender. The Colorado Court of Appeals held the document was an effective letter of credit under the code. In doing so, it pointed out that

the commercial utility of letters of credit lies precisely in their independence from the contract between the customer and the beneficiary. The beneficiary is assured of prompt payment of the debt and business transactions are accordingly facilitated. Thus, the purpose of the letter of credit requires that this unique feature be preserved by courts. [*Id.* at 28]

See also *Victory Carriers, Inc. v. United States,* 467 *F.* 2d 1334, 199 *Ct. Cl.* 410 (1972) (letter of credit for up to $50,000 issued in lieu of performance bond); *Fidelity Bank v. Lutheran Mutual Life Ins. Co.,* 465 *F.* 2d 211 (10 Cir. 1972) (letter of credit for $10,500 issued to serve as standby deposit to guarantee consummation of real property loan); *Fair Pavilions, Inc. v. First National City Bank,* 19 *N. Y.* 2d 512, 281 *N. Y. S.* 2d 23, 227 *N. E.* 2d 839 (Ct. App. 1967) (letter of credit for up to $2,030,000 to guarantee installment payments under a construction contract).

These authorities recognize that the letter of credit is a highly useful device for insuring performance of an obligation to pay money and that its validity should not "depend upon the nature of the transaction in which it is used." Harfield, "Code, Customs and Conscience in Letter-of-Credit Law," 4 *U. C. C. L. J.* 7, 9 (1971). Harfield, a leading commentator in the field, also observed that

[a] commitment to honor a draft accompanied by a bill of lading reciting receipt on board of cases said to contain hog bristles is of no more legal stature than a commitment to honor a draft accompanied by a promissory note said to be in default as to payment of principal or interest. Its traditional sale-of-goods setting certainly does not imbue a letter of credit issued to finance the importation of cigarette tobacco with any greater social or economic utility than a letter of credit issued to ensure the faithful performance of a contract to construct a cancer clinic. The expanded and expanding use of letters of credit is both logical and useful. [*Id.*]

The Banking Act of 1948 and Article 5 of the Uniform Commercial Code, Letters of Credit, should be read in harmony with each other. The Appellate Division quite properly addressed itself to an interpretation of that section of the Banking Act of 1948 which entrusted banks with the authority

to issue letters of credit authorizing holders thereof to draw drafts upon it or upon its correspondence at sight or on time not exceeding one year \* \* \*. [*N. J. S. A.* 17:9A-25(3)]

The one-year limitation, however, does not restrict the duration of a letter of credit, but is addressed to the time period during which a draft may be drawn on the letter. It only qualifies "drafts" rather than the more remote "letters of credit." If the Legislature had intended otherwise, it would have inserted a comma after the word "time." See *Gudgeon v. County of Ocean,* 135 *N. J. Super.* 13, 17 (App. Div. 1975). That letters of credit are not subject to the one-year limitation is confirmed by the action of the Commissioner of Banking, whose regulations on standby letters of credit do not contain a one-year limitation period. *N. J. A. C.* 3:11-9.3. When considering the same issue in *National Surety Corp. v. Midland Bank,* 551 *F.* 2d 21 (3d Cir. 1977), Judge Garth in a careful analysis of the statute also concluded that our statute "has not restricted the duration of letters of credit issued by [state] banks to a one-year period." *Id.* at 35. We agree.

The October 11, 1972 letter of defendant First State Bank of Hudson County fulfilled all the requirements of a standby letter of credit. It advised plaintiff of a commitment to assume the obligation arising from a note signed by Joseph Palladino on October 12, 1972 in the amount of $50,000. It agreed to honor that commitment six months after the date of the note upon notice that the loan had not been paid. Here, then, defendant bank agreed to honor a demand for payment upon notice of nonpayment of the Palladino note.

Although the letter did not expressly direct that the notice must be written, the statute, *N. J. S. A.* 12A:5–103, requires a notice of default to be on paper. Undoubtedly, both parties to this commercial transaction, who were sophisticated businessmen and bankers, knew that a default notice must be written. It is common knowledge in the banking field that written records are made on all aspects of the banking operation. See *N. J. S. A.* 17:9A–247. Terms will be implied in a contract where the parties must have intended them because they are necessary to give business efficacy to the contract as written. *Renee Cleaners, Inc. v. Good Deal Super Markets of N. J., Inc.,* 89 *N. J. Super.* 186, 190 (App. Div. 1964). There is the strongest reason for interpreting a business agreement in the sense which will give it legal support. *Silverstein v. Keane,* 19 *N. J.* 1, 11 (1955). With these principles in mind we find that the parties must have intended that the notice be in writing. Such a construction accords also with the proposition that when the terms of an agreement have more than one possible interpretation, by one of which the agreement would be valid and by the other void or illegal, the former will be preferred. 3 *Corbin, Contracts,* § 546 at 170 (1960); *Kelly v. Guarantee Trust Co.,* 114 *N. J. Eq.* 110, 115 (E. & A. 1933); *G. Loewus & Co. v. Vischia,* 2 *N. J.* 54, 58 (1949). Furthermore, we note in passing that defendant bank has never contended that the letter of credit was invalid because

it did not expressly require that the notice of default be in writing.

█ Defendant bank further contends that its contingent liability of $50,000 on the standby letter of credit would result in a violation of *N. J. S. A.* 17:9A–62A, which provides that the "total liabilities" of any person shall not exceed 10% of the capital funds of the bank. It was undisputed that in October 1972, the bank's capital funds were $1,776,540 and, therefore, its loans to Palladino could not exceed $177,654. Palladino was personally indebted to defendant for $32,000. The bank also claims that in computing Palladino's liabilities those of corporations in which he held a controlling interest must be included. *N. J. S. A.* 17:9A–60(7). It seeks to add a $125,000 indebtedness of Surf Realty Company and a $130,162 debt of Palbro Realty Co. However, the record does not support the conclusion that he held a controlling interest in either corporation at that time. But even if he did, contingent liabilities which might arise out of a letter of credit were not includable as a liability in the computation.[5] This treatment accorded with the established practice that letters of credit were considered contingent liabilities which were not reflected in a bank's balance sheet. Verkuil, *supra,* 25 *Stan. L. Rev.* at 727. [6] It is important to recognize that defendant

---

[5] The New Jersey Department of Banking has recently adopted a regulation which requires that the contingent liability of a standby letter of credit be included in the computation of the lending limit. *N. J. A. C.* 3:11–9.2 (adopted July 20, 1977).

[6] Interpretive Ruling No. 7.1160 of the U. S. Comptroller of the Currency in effect in 1972 provided:

An agreement to lend to a customer or to pay others for its account, under irrevocable sight letters of credit or otherwise, does not result in an obligation subject to the lending limit until the bank is required to make the advance or payment.

This ruling was modified in August 1974 to state that a standby letter of credit is includable in computing the lending limit to a customer. 12 *C. F. R.* § 7.1160 (1977).

.

bank's obligation to pay plaintiff arose out of its independent contractual undertaking with plaintiff and that this obligation did not mature until presentation of a written notice that Palladino had not paid the note. See *Prudential Insurance Co. v. Marquette National Bank,* 419 *F. Supp.* 734 (D. Minn. 1976).

Defendant First State Bank of Hudson County intentionally induced plaintiff to make the loan to Palladino by inviting reliance on the defendant's assurance. For defendant now to refuse to honor its commitment is disingenuous. Enforcement of that obligation in accordance with the terms of the standby letter of credit is fully warranted. The judgments of the Appellate Division are modified and those of the trial court reinstated.

CONFORD, P. J. A. D. (temporarily assigned), dissenting. As argued to the Court, this case apparently projected the question whether the long-standing general statutory policy against banks entering into agreements of guaranty or indemnification, *N. J. S. A.* 17:9A–213.1, should be breached without express legislative authorization under the aegis of so-called "standby letters of credit" — a device increasingly coming into general banking practice. See Arnold and Bransilver, "The Standing Letter of Credit — The Controversy Continues," 10 *U. C. C. L. J.* 272 (1978). The controversy referred to is that between those who are concerned about the threat to solvency of banks in the expanded practice of standby letters of credit and those who believe such credit arrangements are a salutary development in banking practice. Compare Harfield, "The Increasing Domestic Use of the Letter of Credit," 4 *U. C. C. L. J.* 251 (1972), with Verkuil, "Bank Solvency and Guaranty letters of Credit," 25 *Stan. L. Rev.* 716 (1973).

Whether or not the letter in litigation here is as a matter of form classifiable as a standby letter of credit, its substantial identity with a guarantee as commonly understood is so obvious that one would desire more explicit legislative

approval of its validity as a bank obligation than was evident in 1972 when the instant transaction took place. I do not favor erosion of an apparently salutary statutory policy against bank guaranties through judicial ratification of a contrary commercial practice. It may well be that a new emerging policy of commercial convenience should swing the law in a new direction. But I should hope for a clear legislative signal to that effect.

The difference between conventional letters of credit and the standby variety in terms of threat to bank solvency is clear. In the former, typically used to finance sales of goods, the issuing bank's obligation arises only on the delivery of shipping documents evidencing title to the goods. The bank is therefore secure. In the standby letter of credit situation, by the time the bank is called upon to meet the demand of the beneficiary there has typically been a default of the bank customer to the beneficiary and there is no practicable recourse by the bank because of the insolvency of the customer. See Verkuil, *op. cit. supra,* 25 *Stan. L. Rev.* at 727–728; Note, "Guaranty Letters of Credit: Problems and Possibilities," 16 *Ariz. L. Rev.* 822, 832, n. 71 (1974). Coupled with the fact that letters of credit are contingent liabilities not appearing on the bank's balance sheet, Verkuil, *op. cit. supra,* 25 *Stan. L. Rev.* at 727 (and see Court's opinion pp. 47–48), the potential for danger to the public interest of an uncontrolled practice of dealing in standby letters of credit is manifest. The insolvency of the defendant bank before us may have some significance in this regard.

Prior to the adoption of the Uniform Commercial Code in this State in 1961 the only statutory reference to powers of banks to issue letters of credit was *N. J. S. A.* 17:9A–25(3) (*L.* 1948, *c.* 67), empowering banks "to issue letters of credit authorizing holders thereof. to draw drafts upon it * * *." This language is typically adapted to the traditional commercial letter of credit. The "standby" variety was in 1948 neither known nor within statutory contemplation. That a letter of credit was not then conceived as a

potential exception to the general prohibition, by the same 1948 statute, of guaranties or indemnities by banks, see § 213.1 thereof (*N. J. S. A.* 17:9A–213.1), is evidenced by the remainder of *N. J. S. A.* 17:9A–25(3), mentioned above. In addition to authorizing issuance of letters of credit, that section permits a bank "to guarantee, for a period not exceeding one year from the date of such guarantee, the payment by its customers of amounts due or to become due upon the purchase by such customers of real or personal property." Thus the 1948 Legislature made clear the very limited extent to which it was willing to allow banks to make guaranties, while couching its authorization of letters of credit in terms of the conventional commercial financing device then well known.

The foregoing observations gain added pertinence from the very limited use of letters of credit in New Jersey, particularly prior to the adoption of the Uniform Commercial Code. The Introductory Comment to Chapter 5 ("Letters of Credit") by the chairman of the New Jersey Commission which studied the Code prior to its adoption states:

Before the Uniform Commercial Code there was no statutory regulation of Letters of Credit. This chapter has no prior legislative history. *Such letters are used primarily to finance international trade.* Only about 100 United States banks write Letters of Credit and 25 banks write 75% of them. *Very few are written by New Jersey banks.* Letters of credit should gain wide acceptance in domestic use and the clarification of the law respecting their issuance and the rights of all parties taking them should do much to advance their wider use by New Jersey banks.

(emphasis added).

In the light of this background it is difficult to perceive any actual intent by the New Jersey Legislature, in adopting the Code, to wipe out the strong preexisting statutory policy against guaranties and indemnities by banks. The standard letter of credit, as theretofore known in this State, and a guarantee by a bank are seen to be poles apart in nature and function.

It must be conceded, however, that Secs. *N. J. S. A.* 12A:5–102 and 103, read literally, would seem to validate what is technically within the definition of a standby letter of credit. A documentary demand, within the requirement of Sec. 12A:5–102 (1)(a), can consist of a notice of default. Sec. 12A:5–103 (1)(b). Thus a simple letter from a bank to a lender of money to the bank customer that within a stated period the bank will advance a stated sum to the lender upon receipt of a written notice of a default in the loan would seem, facially, to constitute a letter of credit within the Code. I am, however, relieved of the necessity of deciding whether such an engagement would be enforcible against an issuing bank, as against the statutory prohibition of guaranties by banks, by the circumstance that the letter in suit here does not meet the hypothetical case stated nor the intent of the statute even if conceived as authorizing standby letters of credit.

First, and most obvious, the letter in question does not call for the presentation of a document. It requires notice of default, but not a written notice, and it could hardly be denied that if the question of compliance with the Code or the prohibition of bank guaranties were not issues here the letter would be enforcible as between the parties on oral as well as written notice of default. The majority's attempt to bootstrap the validity of the document by resort to the maxim that the law will imply an intent by the parties that the writing be construed in a manner such as to lend validity to it must fail as otherwise the *essence* of the letter of credit — an undertaking by an issuer to pay upon the presentation of specified *documents* — is subverted. This is not a mere technism. It goes to the heart of the nature of a letter of credit. See Uniform Commercial Code Comment to *N. J. S. A.* 12A:5–102, p. 550.

Second, the letter is not limited to an unequivocal undertaking to pay up to a specified sum on presentation of specified documents, but rather injects the bank squarely into the underlying relationship between the bank cus-

tomer, Palladino, and the beneficiary plaintiff. It does this in the first paragraph of the letter, stating that the defendant "will assume the obligations arising from" the underlying $50,000 note given plaintiff by Palladino. While that assumption is made subject to the condition subsequent of receiving notice of default, it is nevertheless otherwise the acceptance by the bank of the status of accommodation co-debtor to the plaintiff for the $50,000 plus interest. Under such an assumption of liability the defendant would be creditable with any payment on account made by the debtor. See *Totowa v. American Surety Co. of N. Y.*, 39 *N. J.* 332, 339 (1963); *Restatement, Security* § 115(1) at 302 (1941). The unqualified absolutism of an undertaking to pay a specified sum of money on a stated proffer of documents, as requisite in a letter of credit, does not exist. Under the letter in question the bank's liability is subject to diminution or discharge depending upon later transactions between the bank customer and the beneficiary, and also to any uncertainty consequent upon disputes between the two as to the amount of the "obligation assumed" owing at any given time.

All of the authorities on letters of credit agree that a situation such as the foregoing defeats the basic intent of a letter of credit. As instructively stated in a recent article:

A fundamental legal principle with respect to letters of credit, embodied in * * * the UCC * * * is that the letter of credit is a contract separate from the underlying agreement, and consequently the rights of the issuer and the beneficiary under the letter of credit are determined only by the terms of the letter of credit itself (i. e., the presentation of the requisite documents), and are not affected by the performance or nonperformance by the applicant, issuer, or the beneficiary of their respective obligations under the underlying agreement and the application.

Arnold and Bransilver, *op. cit.*, *supra*, 10 *U.C.C. L.J.* at 274.

*Cf. Prudential Insurance Co. v. Marquette National Bank*, 419 *F. Supp.* 734 (D. Minn. 1976); *Chase Manhattan Bank v. Equibank*, 550 *F.* 2d 882 (3 Cir. 1977).

The present circumstances, moreover, fix the character of the letter here involved as a true guarantee rather than a standby letter of credit. As explained by the same writers:

> It is important to note, that despite their similarities, the standby letter of credit is not a guarantee. Recovery under a guarantee is predicated upon the primary obligor's nonperformance *in fact* of its guaranteed obligations. The guarantor is therefore only *secondarily* liable with respect to the *same* obligation of the primary obligor. Recovery under a standby letter of credit, on the other hand, requires only the presentation of the requisite documents (*whether or not* the applicant has in fact performed or even may legally perform, its obligations under the underlying agreement), and the issuer is *primarily* liable with respect to its obligations under the letter of credit (which obligations, needless to say, are different from those of the applicant under the underlying agreement). (emphasis in original).
> Arnold and Bransilver, *op. cit. supra*, 10 *U.C.C. L.J.* at 279–280.

Under the analysis above of the letter-instrument before us, it is clear that the defendant bank's obligation *is* predicated on Palladino's nonperformance of his obligation to plaintiff since in the event of performance there would no longer exist the "obligation" which defendant "assume[d]" under the letter. Thus the letter is truly a guarantee, not a letter of credit, even of the standby variety.

For the reasons stated, I am in agreement with the Appellate Division that the letter in question is an illegal guarantee and cannot be enforced in this action because *ultra vires*.[1]

In reference to the alternative holding of the Appellate Division that the letter, if considered a letter of credit, exceeded the one-year limitation of *N. J. S. A.* 17:9A–25(3),

---

[1] The departmental regulations defining a standby letter of credit quoted in the majority opinion (p. 43) are not here pertinent as they were adopted in 1976, long after the transaction in question. Moreover I doubt the authority of the Commissioner to promulgate them, as they do not require submission to the issuing bank of a document, as required by the Uniform Commercial Code.

146 *N. J. Super.* at 12, plaintiff cites the decision in *National Surety Corp. v. Midland Bank*, 551 *F.* 2d 21 (3 Cir. 1977), as authority *contra.* I agree with the majority that the Circuit Court of Appeals correctly decided that the one-year limitation in the section cited qualifies only time drafts drawn on a letter of credit and not letters of credit themselves. This conclusion is impelled not only by the most natural grammatical construction of the verbiage but by the circumstance that in the very next clause of the same provision a time limitation of one year for certain kinds of guaranties is phrased in terminology which is explicit and which could have been used in the provision as to letters of credit had it been the intent that the time limitation was to be applicable to letters of credit themselves rather than to time drafts.

And capping the case for the indicated result is the fact that in the same 1948 statute (*c.* 67) which was the precursor of *N. J. S. A.* 17:9A–25(3) the Legislature also fixed a one-year period as the measure of staleness of a check. *L.* 1948, *c.* 67, § 229 (later *N. J. S. A.* 17:9A–229). Although the subsequent enactment of the Uniform Commercial Code changed the staleness period to six months, *N. J. S. A.* 12A:4–404, and see *New Jersey Study Comment* thereto, p. 523, the co-enactment in 1948 of the one-year limitation periods mentioned strongly indicates the time limitation in the letters-of-credit provision applied to drafts, not to letters of credit *per se*.[2]

Despite my views as to the one-year limitation I would affirm the judgment of the Appellate Division for the reasons already stated. In view thereof I do not reach the question whether the letter of credit was illegal because

[2]Contrast the 1976 regulations of the Department of Banking with respect to standby letters of credit requiring that "the bank's undertaking contains a specified expiration date or be for a definite term; * * * ." *N. J. A. C.* 3:11–9.3(a)1.

resulting in total liabilities of the bank to one person exceeding 10% of the capital funds of the bank.

Justice CLIFFORD joins in this opinion.

*For modification and reinstatement* — Chief Justice HUGHES and Justices PASHMAN, SCHREIBER and HANDLER —4.

*For affirmance* — Justice CLIFFORD and Judge CONFORD —2.