**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3459-18T2

MAREK CHWIEJ,

    Plaintiff-Respondent,

v.

193 CONCORD DRIVE, LLC,
R.T.R. HOLDING CORPORATION,
and RICHARD RIZZO,

    Defendants-Appellants,

and

HAYDEN ASSETS II, LLC,

    Defendant.

_____

> Submitted March 4, 2020 – Decided June 19, 2020
>
> Before Judges Whipple, Gooden Brown and Mawla.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Bergen County, Docket No. C-000081-17.
>
> Patrick O. Lacsina, attorney for appellants.

Respondent has not filed a brief.

PER CURIAM

Defendants, Richard Rizzo and his two solely-owned entities, R.T.R. Holding Corp. (RTR) and 193 Concord Drive, LLC (193 Concord),[1] appeal from a January 9, 2019 order enforcing a settlement agreement requiring them to pay plaintiff Marek Chwiej a share of their profits from the sale of a property, as well as a March 1, 2019 order denying reconsideration. We affirm.

In May 2005, plaintiff bought property in Fair Lawn for $315,000. He took out two construction mortgages—one for $450,000 and one for $50,000—through Pamrapo Bank, which later merged with and became BCB Bank (BCB). In 2010, plaintiff tried to sell the property, which the listing described as "new construction on [a] new foundation[—]colonial to be finished," with ninety percent of the work completed.

Plaintiff and BCB executed a note extension agreement in May 2011, but plaintiff defaulted on the loans. On February 1, 2012, plaintiff entered into a mortgage modification agreement, which consolidated the two loans, and also

---

[1] Since RTR and 193 Concord are all solely owned by Rizzo, and Rizzo was the only individual to testify for RTR and 193 Concord, we refer to all three interchangeably as defendants.

A-3459-18T2

executed an escrow agreement, which required plaintiff to execute a deed in lieu of foreclosure to BCB.

When plaintiff did not pay the loan, BCB sold the loan, including the deed in lieu of foreclosure, to Hayden Assets II, LLC (Hayden) in June 2012. Hayden assigned the mortgage to 193 Concord in April 2013. On September 17, 2013, 193 Concord gave plaintiff notice his loan was in default, and that if he did not cure the default by paying $3621.42, 193 Concord would exercise its rights pursuant to the escrow agreement and record the deed in lieu of foreclosure. Plaintiff did not cure the default, and on April 14, 2014, BCB transferred its ownership of the property through a quit claim deed to 193 Concord, which was then recorded.

Plaintiff filed suit against defendants on March 21, 2017, alleging that: when he executed the loan modification, he was not aware he was signing a deed in lieu of foreclosure; he was not aware he was agreeing to a balloon payment; he was unrepresented by counsel; and at no time did BCB[2] recommend he seek counsel or explain to him the deed in lieu of foreclosure or the balloon payment. Plaintiff alleged Rizzo conspired with 193 Concord and RTR, as well as with

---

[2] Claims against BCB were dismissed with prejudice in a prior lawsuit filed by plaintiff in the Law Division, and BCB is not a party to this appeal.

BCB, to cause a series of events resulting in the fraudulent issuance of a notice of default on the restructured mortgage note and mortgage modification agreement on the property. Plaintiff sought to have the deed in lieu of foreclosure declared void, as well as money damages, treble damages, attorney fees, statutory damages, and costs of suit for alleged violations of: the Fair Debt Collection Practices, 15 U.S.C. § 1692; the Federal Fair Credit Reporting Act, 15 U.S.C. § 1681; the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605; and the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2.

Defendants moved to dismiss without success. However, the parties then attended mediation, which resulted in the July 2018 settlement agreement that is the subject of this appeal. The settlement agreement provided that the parties would divide net profits, "if any," from the sale of the property. Net profits were defined as the gross sale price "less [a]ll [c]osts outlined in the sale HUD-I[3] closing statement" and "as adjusted by [a]ll [c]osts incurred by Rizzo."

The agreement further provided that "'[a]ll [c]osts' will include, but will not be limited to, the following out-of-pocket expenses incurred by Rizzo:" (1) "[w]hat he paid for the notes as purchased from the bank"; (2) "[c]osts of

---

[3] The HUD-1 is a document that lists all charges and credits to the buyer and to the seller in a real estate transaction.

improvements to prepare the property for sale including material, labor, and Rizzo's management of the repairs to sell the house"; (3) "[p]roperty taxes"; (4) "[u]tilities"; (5) "[i]nterest paid to carry the debt, including the two mortgages (Rizzo Living Trust and DM RE Holdings [(DM)]) used to finance the property as evidenced in the September 7, 2017 closing statement"; (6) "[p]roperty insurance"; (7) "[s]torage and moving costs of [plaintiff]'s chattel from the property"; and (8) "[a]ttorney's fees related to litigation filed by [plaintiff]."

Rizzo was to "provide backup proof of payment of '[a]ll [c]osts' within two weeks by way of receipt, copy of checks, or other reasonable means of proof; any objection by [plaintiff] to any item(s) shall be made within one week of their having been provided." Plaintiff's objections were to "be reasonable and be made in good faith." If the costs incurred by Rizzo exceeded the net sales price, there would be no profits to divide.

The agreement also provided that "[t]he parties will dismiss the case with prejudice and without costs, and sign mutual releases only once and if the parties agree on the costs to which the [d]efendant(s) claim as credits, otherwise the case shall be restored to the court docket." Each party was to pay their own counsel fees in connection with the litigation, and all court proceedings were to be stayed pending finalization of the settlement agreement, or, in the alternative,

stayed until the matter was returned to court as "not settled" should the parties fail to agree on all terms of the settlement agreement.

The last provision provided:

> In the event [p]laintiff does not agree to permit [d]efendant[]s['] attorney fees, management fees, or other expenses claimed by [d]efendant[s] to be credited against the proceeds of the sale, [p]laintiff shall have the right to object to [d]efendant[]s['] claims, at which time, the parties shall, through counsel, attempt to resolve such objections within [fourteen] days. The parties agree to return to [c]ourt and mark this matter as "not settled" should the parties fail to resolve any such objections within [fourteen] days.

The house sold on September 7, 2017 for $539,000. Minus closing costs, the net amount due to defendants was $38,769.65. Rizzo compiled a "Property Profit & Loss Statement" that listed, in line item form, credits and costs pertaining to the property. The sales price of $539,000 plus two credits totaling $9994.73—one a property tax credit and one described as mortgage payment income—totaled $548,994.73, while twenty-four line items of costs totaled $600,591.94, for a net loss on the property of $51,597.21.

Plaintiff objected to all but five of the line item costs, as well as the backup proof of payment of "[a]ll [c]osts," so the trial judge scheduled a plenary hearing as to the disputed items, with Rizzo and plaintiff as witnesses.

6                                                                        A-3459-18T2

The costs plaintiff accepted were the first mortgage interest, certain property taxes, insurance, and recording fees. He objected to and asked for supporting documents for: the real estate commissions and transfer tax, asking for the HUD and sale settlement statement; the attorney's fees for the sale transaction, asking for the closing attorney's information; the $437 in water and $3636 in utilities, asking for any lease agreements if the property was rented out to tenants; the $240,000 purchase note for the first mortgage, asking for the note release documents from the releasing bank, the note assignment, the cancelled check, and a copy of the "ENO" Policy for transaction of the purchase of the note and mortgage; the wire transfer fee; and the $1200 and $6600 for legal fees. Plaintiff also objected to the $24,713.45 second mortgage interest and asked that defendants provide a good faith estimate and Truth in Lending Act disclosures for both the first and second mortgages defendants held on the property.

Plaintiff further objected to $3321.94 in moving and storage fees, asserting his access to the property was blocked and the storage was rented for the convenience and responsibility of defendants after they used plaintiff's building materials without his permission to finish the house. Plaintiff also contended he was neither provided with an address for the storage unit, nor with a record of items that were taken there.

A-3459-18T2

Plaintiff objected to landscaping costs of $6455.99, $492 in bank fees, over $50,513.85 in repairs, and the LLC fee, asserting it was a tax deductible business expense that should be borne by defendants. Plaintiff further objected to the $4500 granite fee, which was paid by defendants' investor and lender DM, asserting the "[k]itchen countertop was installed and paid for by [plaintiff]. [Ae]sthetic changes of materials or color were made at . . . Rizzo's . . . preference and therefore it is his cost." As to the final two line items, plaintiff objected and asked for pay stubs or the 1099 form for the coordinating service, the relevant years' tax returns for the $27,882.79 in coordinating and consulting fees, and asked for the Schedule E from Rizzo's tax returns or the "lease agreement" for the mortgage payments of $9053.52.

At the plenary hearing, Rizzo submitted: 1) the profit and loss statement; 2) numerous bills and invoices for costs; 3) a check register of each check made against the bills and invoices; 4) credit card receipts; and 5) corresponding bank statements showing the checks were withdrawn from defendants' accounts.

Rizzo testified that he purchased plaintiff's note in 2013 from a hedge fund. The note matured on January 1, 2014, and when plaintiff did not pay it off, Rizzo recorded the deed in lieu, which was included in his purchase of the

note. Rizzo testified he told plaintiff to vacate the property, which was under construction, so Rizzo could sell it.

Rizzo asserted he did not make any money on his investment in the property, as after he finished construction plaintiff filed a lis pendens which prevented Rizzo from selling it. During that time, Rizzo made repairs and modifications to the property, incurred legal fees, and paid property taxes, insurance, upkeep, repairs, water, utilities, and landscaping fees.

Rizzo testified he used a "hard money lender" to finance the property with two loans—one for a principal amount of $242,000 for the purchase, and another for approximately $60,000 for repairs and carrying costs. The interest was $133,283.04 on the first mortgage and $24,713.45 on the second; the payments were made at the sale closing.

The first mortgage was through Rizzo Living Trust, a bank account Rizzo held with his ex-wife, who was the lender. Rizzo did not recall the interest rate on the loan from Rizzo Living Trust, and stated the note was "probably in a file somewhere," but did not produce it in court. He testified the loan from his ex-wife was reflected in his bank statement in a May 13, 2013 deposit.

The second mortgage was through DM, the investor in the property. Rizzo asserted the interest rate on the DM loan was "the same typical thing," meaning

the interest rate would have been comparable to that of the loan from his ex-wife, and that it was paid at closing. He testified the loan from DM was reflected in deposits of: $25,000 on July 17, 2014; $15,000 on September 4, 2014; $8000 on September 26, 2014, $12,000 on April 15, 2015, and a $4500 payment for the granite countertop for a total of $64,500.

There was no line item for the payoff of the second mortgage for DM on defendants' profit and loss statement. Rizzo testified the payoff to DM was part of the $4500 as "[g]ranite paid by DM," and that it was listed on the HUD closing statement. Rizzo testified that the loans from DM, which totaled $60,000, were in the various costs and expenses reflected in the profit and loss statement to make repairs and finish construction. He testified the loan payoff to DM was not a separate line item because "it wasn't a cost to the property. Only the interest was the cost. Only the advancement was the cost."

Rizzo testified he made $50,513.85 worth of repairs to the property to "put the house back together"; he contended it was under construction at the time he acquired it, and he needed to finish both the basic construction and make additional repairs. When asked whether all the repairs made were necessary, Rizzo testified that the $50,513 worth of repairs were "mandatory to sell the property," like "putting the kitchen back together. Putting bathrooms back

together.  Roofing repairs.  Carpentry repairs."  Rizzo testified the repairs also included: roof and siding repairs for $4000; power washing the house and deck for $267.50; repairs to the HVAC unit for $500; removal of a tree for $700; an appliance, which Rizzo thought was a dishwasher, for $502; tile for $904; and multiple other expenses related to work on the house, all which Rizzo asserted were in the exhibits and reflected in receipts and invoices.

Rizzo also testified about other expenses listed on his profit and loss statement for the property, which included: a $21,310 real estate commission; a $4549.40 real estate transfer tax; $1150 in closing costs; and $4228.67 in property taxes, which were also reflected in the HUD closing statement.  He testified the "coordinating and consulting" fees listed were to the realtor who brought him the non-performing loan and secured the deal for him.  When asked if he had a bill for the "coordinating and consulting" fee, Rizzo responded that he "believe[d]" he would have a bill, but he did not know if it was in the pile of documents he had with him, and was unable to locate it in court.

Rizzo also could not produce the payoff of either the first or the second hard money loans.  He testified the management cost, which was the cost to put the project together, was $27,882.79, which he paid to DM.  He also testified that he incurred moving and storage expenses of $3321.94 to move plaintiff's

11

belongings out of the house but could not produce documentation to show what specifically was put in storage.

Rizzo had bank account statements reflecting the quarterly real estate taxes, as well as the invoices and bills for landscaping totaling $6455.99. Rizzo testified the mortgage payment income line on the profit and loss statement for $9053.52 reflected the payments made by plaintiff when the loan was in default; it was credited as income to the property.

As to the legal fees on the profit and loss statement, Rizzo testified they were over $6000, some of which were from multiple lawsuits filed by plaintiff, and asserted they were reflected in the check register through checks made out to the firm Ralph Casale and Associates, for "legal fees" and "legal fee to purchase mortgage note." However, there was only one itemized invoice for legal fees, dated August 23, 2017, listing two hours at a rate of $250 per hour for "[d]rafting of [p]roposed [c]ontesting [a]nswer" and one hour at a rate of $225 for "[m]otion [f]iling [f]ee and [a]nswer [f]iling [f]ee," along with the cancelled check for that invoice for a total of $725.

When asked whether the figures on his profit and loss statement were claims he was making for credits against the purchase price for the property, and whether he was claiming his costs were more than he realized from the sale of

the property based on the numbers from the profit and loss statement, "assuming the [c]ourt accepts all of the claims that you're asserting for various items that are on the list," Rizzo responded "[w]hatever the [c]ourt does, the [c]ourt does. That's what it did on my books. Yes . . . [t]he profit and loss is, again, my costs and my sale. What is left at the end of the day."

After reviewing the evidence, the judge found 193 Concord sold the property for $539,000, and the closing statement deducted costs from the gross sale price for, including but not limited to: real estate commissions of $21,310; a realty transfer fee of $4549.40; a payoff to the Rizzo Living Trust of $375,283.04; closing legal fees of $1150; third quarter real estate taxes of $4228.67; a payoff to DM for $89,213.45; and a water bill of $437. The judge noted the net amount due to 193 Concord at closing was $38,769.65.

Addressing the proofs submitted by Rizzo pursuant to the settlement agreement, the judge found no dispute as to the costs listed on the closing that were standard charges generally paid by the seller at closing. Nor did the judge find there was a dispute as to the $242,000 loan from the Rizzo Living Trust, and found the $375,283.04 payment to the Rizzo Living Trust related to that loan reasonable.

A-3459-18T2

However, the judge found the loans made by DM lacked supporting documentary evidence. While Rizzo's testimony revealed the loans were used primarily for purported improvements or repairs, he failed to provide any evidence, other than the repair receipts, to support the reasonableness or necessity of the repair costs. Nor did defendants present evidence to support the underlying loans from DM, such as loan documents or notes, and the judge rejected them.

As to the balance of defendants' "alleged offsets," the judge found

> defendants have failed to present any credible evidence regarding the balance of the associated costs, including the reasonableness or necessity of the alleged repairs, the reasonableness of the claim to management fees, or the basis on which the defendants seek to assert legal fees, other than the legal fees associated with the sale of the . . . property. Instead, defendants chose to rely upon or make reference to invoices and bank account statements to support its claim . . . without any specific testimony as to the reasonableness or necessity of such amounts. It is not up to this [c]ourt to pick through these documents in an effort to make the defendants' case. Rather, it was the defendants' responsibility to prove the reasonableness of the amounts requested.

The judge allowed total deductions of $471,075.09 to reduce the purchase price of $539,000 and disallowed the balance of the claimed deductions. Net sale proceeds for distribution were found to be $67,924.91, and, pursuant to the settlement agreement entitling plaintiff to fifty percent of the net proceeds,

14

plaintiff was awarded $33,962.46. The judge entered an order on January 9, 2019 reflecting his decision.

Defendants moved to vacate or amend the order. On March 1, 2019, the judge denied the motion both because plaintiff filed a notice of appeal on February 21, 2019, leaving the court only with jurisdiction to enforce the judgment or correct the order, as well as because, even if the trial court had jurisdiction, defendants failed to present any new facts not previously provided to the court. Defendant Rizzo then appealed the March 1, 2019 order as well as the January 9, 2019 order to enforce settlement.

On appeal, defendants argue that the trial judge impermissibly rewrote the unambiguous settlement agreement when he imposed the "reasonable and necessary" standard to defendants' costs, as that standard is not expressly stated in the settlement agreement. Defendants also argue the judge erred when he did not award attorney's fees, as set forth in the settlement agreement, and that the judge committed plain error when he excluded defendants' repair and management fees from allowed costs. We disagree.

We address the judge's treatment of the settlement agreement as a matter of law, and we review matters of law de novo. Potomac Ins. Co. of Ill. ex rel. OneBeacon Ins. Co. v. Pa. Mfrs. Ass'n Ins. Co., 215 N.J. 409, 421 (2013);

A-3459-18T2

McGovern v Rutgers, 211 N.J. 94, 108 (2012). "A settlement agreement between parties to a lawsuit is a contract," Nolan v. Lee Ho, 120 N.J. 465, 472 (1990) (citing Pascarella v. Bruck, 190 N.J. Super. 118, 124 (App. Div. 1983)), and the interpretation of a contract is subject to de novo review by an appellate court, Kieffer v. Best Buy, 205 N.J. 213, 222-23 (2011).

Defendants, relying on Christafano v. N.J. Mfg. Ins. Co., 361 N.J. Super. 228, 237 (App. Div. 2003), and Kaur v. Assured Lending Corp., 405 N.J. Super. 469, 476 (App. Div. 2009), argue the trial judge rewrote the unambiguous settlement agreement by imposing a "reasonable or necessary" test to the costs incurred when the settlement agreement did not contain any such language. We reject that argument.

A settlement agreement "is a contract which, like all contracts, may be freely entered into and which a court, absent a demonstration of 'fraud or other compelling circumstances,' should honor and enforce as it does other contracts." Pascarella, 190 N.J. Super. at 124-25 (quoting Honeywell v. Bubb, 130 N.J. Super. 130, 136 (App. Div. 1974)).

Where a term or provision of an agreement has been omitted, "[a]rrangements embodied in a contract may be such that the parties have impliedly agreed to certain terms and conditions which have not been expressly

stated in the written document." Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 181-82 (1981). See also Bak-A-Lum Corp. v. Alcoa Bldg. Prod., 69 N.J. 123 (1976); Atl. N. Airlines, Inc. v. Schwimmer, 12 N.J. 293 (1953). The implied covenant of good faith and fair dealing, which exists in every contract, "permits the inclusion of terms and conditions which have not been expressly set forth in the written contract," and "acts in such instances to include terms 'the parties must have intended . . . because they are necessary to give business efficacy' to the contract." 49 Elga A. Goodman, et al., N.J. Practice, Business Law Deskbook, § 7.26 (2019-2020 ed.) (alteration in original) (quoting N.J. Bank v. Palladino, 77 N.J. 33, 46 (1978)).

We do not agree the judge's imposition of a "reasonableness or necessity" test improperly rewrote the agreement. The agreement stated Rizzo may deduct costs of improvements to prepare the property for sale, including costs incurred by Rizzo to sell the house. The costs allowed were only those incurred for the express purposes of preparing the property for sale and selling the house. Were the agreement meant to give Rizzo license to spend without restraint, there would be no reason to include the provision allowing plaintiff to make good-faith objections.

Defendant also argues the judge incorrectly interpreted the settlement agreement by excluding litigation fees, as the agreement "plainly and specifically allows [l]itigation fees to offset the [g]ross [s]ales price." We disagree.

While New Jersey follows the "American rule," where each party is responsible for its own legal fees, fees may be shifted when permitted by statute, court rule, or contract. Grow Co. v. Chokshi, 424 N.J. Super. 357, 367 (App. Div. 2012) (citing Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 440 (2001)). Rule 4:42-9(a)(1)-(8) specifically precludes the grant of counsel fees except in certain specified instances, which include: a family action; out of a fund in court; in a probate action; in an action for foreclosure of a mortgage; in an action to foreclose a tax certificate; in an action upon a liability or indemnity policy of insurance in favor of a successful claimant, as expressly provided by court rules; and where attorney's fees are permitted by statute. Attorney's fees are also permitted where they "have been agreed to in advance by contract." Satellite Gateway Commc'ns, Inc. v. Musi Dining Car Co., Inc., 110 N.J. 280, 286, 288 (1988) (emphasis added); see also Pressler & Verniero, Current N.J. Court Rules, cmt 2.10 on R. 4:42-9 (2019). A court "is not empowered to award counsel fees and expenses absent express authorization by statute or rule of

court." 4 James H. Walzer, N.J. Practice, Civil Practice Forms § 57:8 n.2 (6th ed. 2006) (citing Miller v. Municipal Council of Wayne Tp., 139 N.J. Super. 526 (App. Div. 1976)).

Here, it is not clear on what basis defendants' attorney's fees could have been deducted from the gross sales price—this matter does not fall under any of the permitted fee-shifting actions enumerated in Rule 4:42-9(a)(1)-(8); the fees were not contracted in advance of the litigation, as may have been allowed under Satellite Gateway; and there is no statute or court rule referenced in the settlement agreement, trial court opinion, or brief as to any potential legal basis.

Defendant submitted documentation of payments to attorneys, but, except for a single invoice for $725 out of what defendants claimed were over $6000 in legal expenses, there is no hourly rate or itemized description of work done. Therefore, even if there were a legal basis for defendants to recoup legal fees, defendants did not provide sufficient proofs for the judge to make a determination of what fees would be permissibly deducted.

Finally, defendant asks us to find plain error in the judge's exclusion of repair and management fees from offset of the gross sale price. We find none. Plaintiff objected to certain costs and asked for supporting documents. Defendants did not provide the requested documents, but merely submitted

invoices and receipts that indicated the amount of money they spent on "repairs" and "work," but that did not indicate how the work contributed to the purposes of preparing the house for sale and of selling the house. Neither did Rizzo's testimony indicate how the work contributed to preparing the house for sale or to selling the house, other than general statements that they needed to put the house back together.

There is no specific evidence in the record regarding the condition of the house, what warranted repairing, or even evidence of how aesthetic and discretionary changes might have contributed to marketing the house for sale. Defendants had the chance to present their case, rebut plaintiff's objections, and offer those proofs at the plenary hearing, but their proofs were lacking.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3459-18T2