**VICTORY CARRIERS, INC.,**

v.

**The UNITED STATES.**

**No. 273–70.**

United States Court of Claims.

Oct. 13, 1972.

Charles Leonard Egan, Washington, D. C., for plaintiff; J. Franklin Fort, Washington, D. C., attorney of record; T. S. L. Perlman and Kominers, Fort, Schlefer & Boyer, Washington, D. C., of counsel.

George M. Beasley, III, Washington, D. C., with whom was Acting Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, LARAMORE, Senior Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA and KUNZIG, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

SKELTON, Judge:

Plaintiff, Victory Carriers, Inc., (Victory) entered into a General Agency Agreement with the United States, acting through the Maritime Administration (Maritime) whereby Victory agreed to manage certain vessels of the government, including the payment of certain expenses such as salaries to members of the crews, port expenses, repairs, etc.

Victory established a special bank account into which Maritime made deposits to cover the estimated expenses of operating the ships. Victory was authorized to make disbursements from this account for vessel expenses.

The pertinent provisions of the agreement are as follows:

Article 1. *Appointment of general agent.*—The United States appoints the General Agent as its agent and not as an independent contractor, to manage and conduct the business of vessels assigned to it by the United States from time to time and accepted by the General Agent.

Article 2. *Acceptance of appointment.*—The General Agent accepts the appointment and undertakes and promises so to manage and conduct the business for the United States, in accordance with such directions, orders or regulations not inconsistent with this Agreement as the United States has prescribed, or from time to time may prescribe, and upon the terms and conditions herein provided, of such vessels as have been or may be by the United States assigned to and accepted by the General Agent for that purpose.

Article 3. *Duties of the general agent.*—For the account of the United States, in accordance with such directions, orders, regulations, forms and methods of supervision and inspection as the United States may from time to time prescribe (or in the absence of such directions, orders, regulations, forms and methods of supervision and inspection, in accordance with reasonable commercial practices and/or the use of customary commercial forms), in an economical and efficient manner, and exercising due diligence to protect and safeguard the interests of the United States in connection with the duties prescribed in this Agreement and without prejudice to its rights under Article 6 hereof, the General Agent (solely as agent of the United States and not in any other capacity) shall:

(a) Conduct the business of the vessels including, but not limited to, all matters with respect to voyages, cargoes, mail, passengers, persons to be carried, charters, rates of freight and charges; and procure or provide all services incident thereto including, but not limited to, stevedoring and other cargo handling, port activities, wharfage and dockage, pilotages, canal transit and services of sub-agents, brokers and consulates.

(b) Collect, deposit, remit, disburse and account for all monies due the United States arising in connection with activites under or pursuant to this Agreement, and to the extent disbursements made by the General Agent pursuant to this Agreement are recoverable from insurance, the General Agent shall take such steps as may be appropriate to effect such recovery for the account of the United States.

(c) Equip, victual, supply and arrange for the repair of the vessels covering hull, machinery, boilers, tackle, apparel, furniture, equipment and spare parts, and including maintenance and voyage repairs and replacements, as may be necessary to maintain the vessels in an efficient state of repair and condition; and cooperate with representatives of the United States in making any inspections or investigations that the United States may deem desirable.

\*　\*　\*　\*　\*　\*

(f) Furnish and maintain during the period that any vessel is assigned and accepted by the General Agent under this Agreement, at its own expense, a bond with sufficient surety in such amount as the United States shall determine such bond to be approved by the United States as to both sufficiency of surety or sureties and form, and to be conditioned upon the due and faithful performance of all and singular the covenants and agreements of the General Agent contained in this Agreement, including without limitation of the foregoing the condi-

tion faithfully to account to the United States for all funds collected and disbursed and funds and property received by the General Agent or its sub-agent. The General Agent may, in lieu of furnishing such bond, pledge direct or fully guaranteed obligations of the United States of the cash value of the penalty of the bond under an agreement satisfactory in form to the United States.

\* \* \* \* \* \*

Article 4. *Compensation.*—At least once a month the United States shall pay to the General Agent compensation for the General Agent's services hereunder, and, after redelivery of the vessels assigned hereunder, shall also pay to the General Agent compensation for services required thereafter. All such compensation shall be in such fair and reasonable amount as the United States shall from time to time determine by National Shipping Authority Order. Such compensation shall be deemed to cover the General Agent's administrative and general expense (as presently itemized in General Order No. 22 of the Maritime Administration) and also fees to sub-agents, branch houses and customs brokers, charges for postage and petties, and communication expenses, in the continental United States, advertising expenses, taxes (other than taxes for which the General Agent is credited under Article 5 hereof), and any other expenses which are not directly applicable to the activities, maintenance and business of the vessels assigned hereunder.

Article 5. *Disbursements.*—The United States shall advance funds to the General Agent to provide for, and the General Agent shall receive credit for all expenditures of every kind made by it in performing, procuring, or supplying the services, facilities, stores, supplies or equipment as required hereunder, excepting the items of expense as are deemed to be covered by the compensation provided for in Article 4 hereof, provided that the General Agent shall receive credit for sales and similar taxes or foreign taxes of any kind to the extent classifiable as vessel operating expense under said General Order No. 22, if the General Agent shall have used due diligence to secure immunity from such taxation. The United States shall also advance funds to the General Agent to provide for, and the General Agent shall receive credit for, all crew expenditures accruing during the term hereof in connection with the vessels assigned hereunder, including, without limitation, expenditures on account of wages, extra compensation, overtime, bonuses, penalties, subsistence, repatriation, internment, travel, loss of personal effects, maintenance and cure, vacation allowances, damages or compensation for death or personal injury or illness, insurance premiums, \* \* \*.

The United States may deny credit to the General Agent in whole or in part, as the United States may deem appropriate, for payment of expenses which are found to have been made in wilful contravention of any outstanding instructions or which are found to have been clearly improvident or excessive.

Article 6. *Insurance and indemnification.*—

\* \* \* \* \* \*

(d) The General Agent shall be under no liability to the United States of any kind or nature whatsoever in the event that the General Agent should fail to obtain officers or crews for the vessels assigned hereunder, or fail to arrange for the fitting out, refitting, maintenance or repair of said vessels, or fail to perform any other service hereunder by reason of any labor shortage, dispute or difficulty, or any strike or lockout or any shortage of material or any act of God or peril of the sea or any other cause beyond the control of the General Agent whether or not of the same or similar nature, or should do or fail to do any act in

reliance upon instructions of military or naval authorities.

\* \* \* \* \* \*

Victory chose not to file the performance bond provided for in Article 3(f), but in lieu of such bond furnished Maritime an irrevocable letter of credit in the sum of $50,000 with Marine Midland Grace Trust Company of New York. The letter of credit in favor of Maritime provided in pertinent part as follows:

We hereby authorize you to value on Marine Midland Grace Trust Company of New York

For Account of

> VICTORY CARRIERS, INC.
> 15–73455–2
> 647 5th AVENUE
> NEW YORK, NEW YORK

Up to an aggregate
amount of

FIFTY THOUSAND AND
00/100 ($50,000.00)
DOLLARS

Available by your drafts at sight for invoice value bearing this credit number accompanied by

YOUR STATEMENT THAT CONDITIONS SPECIFIED IN THE GENERAL AGENCY AGREEMENT CONCLUDED BETWEEN OURSELVES AND THE ACCOUNTEE HAVE BEEN BREACHED.

———◆———

Thereafter, Maritime deposited funds in the special account pursuant to the agreement. In August 1967, Victory was informed that the S.S. Beatrice Victory, one of the ships managed by Victory for Maritime would dock at Toledo, Ohio, where it was to be serviced and the crew paid off. Victory did not have an office or representative in that city and appointed Compass Agency, Inc., (Compass) as its sub-agent to handle the payroll and servicing of the Beatrice Victory. Pursuant to this arrangement, Victory transferred $68,500 from the special account to the bank of Compass in Toledo, Ohio. An employee of Compass forged a Compass check, using a rubber stamp of the authorized Compass signature and withdrew $65,000 from the account and absconded with the money. He was later arrested, tried, and convicted and sent to prison. The sum of $15,513 was recovered, leaving a shortage of $49,487. Victory refused to restore this amount to the special account. Maritime then drew a draft in the sum of $49,487 on the above-described letter of credit and accompanied the draft with a letter to the bank stating:

Enclosed is our sight draft for $49,487.00 drawn against Letter of Credit No. 62078, issued by you for $50,000.00 to secure the performance by Victory Carriers, Inc., of its General Agency Agreement with the Maritime Administration.

The conditions specified in the General Agency Agreement have been breached by Victory Carriers, Inc., resulting in a financial loss to the Maritime Administration in the amount of the enclosed sight draft.

The draft was paid. Victory then protested, saying the drawing of the draft was unauthorized because it had not breached the agreement. It called upon Maritime to repay the amount of the draft and when Maritime refused, this suit was filed.

██ Victory contends that the bank was not authorized to cash the check of Compass that was presented for pay-

ment by its dishonest employee bearing a rubber stamp signature, and that the government should sue the bank for the recovery of the funds. We see no merit in this argument. It may be that Victory has a claim against the bank on this basis, but there is no obligation on the part of the government to litigate a claim between third parties. There is nothing to prevent Victory from suing the bank.

■ Victory also contends that the government should sue Compass and its insurance company that had issued a policy covering losses caused by the dishonest acts of Compass' employees up to the sum of $50,000. Here again the government is not obliged to litigate claims such as these, as they are matters involving only third parties. No explanation has been given why Victory has not proceeded against the insurance company, assuming, arguendo, that the insurance policy covered the dishonest act and resulting loss involved here.[1]

■ The government had a right to rely on the letter of credit for the performance of the agreement by Victory. The letter of credit was furnished in lieu of a performance bond, and was in effect, the same as a performance bond with the same condition and penalty as a performance bond. It will be recalled that the condition and penalty of a performance bond, if one had been furnished, as quoted in Article 3(f) above, was:

> * * * [C]onditioned upon the due and faithful performance of all and singular the covenants and agreements of the General Agent contained in this Agreement, including * * * the condition faithfully to account to the United States for all funds * * * and property received by the General Agent or its sub-agent. * * *

This penalty and condition of the bond are considered to be incorporated in and applicable to the letter of credit that was furnished in lieu of a bond.

■ It will be noted that in addition to Article 3(f) above, which required Victory to "account to the United States for all funds received" by it or its sub-agent, Article 3(b), which describes some of the duties of Victory, states:

> (b) Collect, deposit, remit, disburse *and account for all monies due the United States* arising in connection with activities under or pursuant to this Agreement * * *. [Emphasis supplied.]

These provisions of the agreement clearly imposed an obligation on Victory to "account for" all monies and funds received by it or its sub-agent or due the United States in connection with activities under the contract.

■ Victory makes the ingenious argument that the term "account for" imposes no obligation on it in this case except to report to the government and inform it as to what happened. This contention is not reasonable. Under this theory, Victory could report to the government that the money had been misplaced and could not be found, or any other fanciful explanation, without any liability on Victory. If this is what the phrase meant, it is inconceivable that a performance bond or letter of credit in the sum of $50,000 would be required to guarantee the performance of such a simple and routine administrative reporting task.

We hold that the term "account for," as used in the agency agreement before us, means not only to render an accounting of the money but also to be responsible therefor and to pay over to the United States the amount of the shortage. The authorities support this position. *See* United States v. Rehwald, 44 F.2d 663 (S.D.Cal.1930); Port of Seattle v. Fidelity & Deposit Co., 24 F.Supp. 434, 436 (W.D.Wash.1938), rev'd on other grounds, 106 F.2d 777 (9th Cir. 1939); Hamilton Nat'l Bank v. United States, 99 F.2d 570, 573 (6th Cir. 1938); In re Pringle's Estate, 51 Wyo. 352, 67 P.2d 204 (1937); The "Idaho," 93 U.S. 575,

---

1. Compass has been adjudged a bankrupt.

579, 23 L.Ed. 978 (1876); and Hale County, Tex. v. American Indem. Co., 63 F.2d 275 (5th Cir. 1933).

■■ The plaintiff says it is not liable for the loss because of the principle that a master is not liable for the criminal acts of its agent outside the scope of the agent's employment, citing Inland Trucking Corp. v. United States, 281 F. 2d 457, 150 Ct.Cl. 642 (1960). In this connection it argues that since Compass is not liable for the dishonest act of its employee, Victory cannot be liable. We do not think that *Inland* stands for this proposition as applied to this case. The portion of that opinion relied on by Victory to support this argument appears to have been considered out of context, as it obviously referred to a situation where a principal cannot be held liable to third parties for the criminal acts of its employees in the absence of a contractual duty. That is not the case here, as Victory had an express contractual duty to account for the funds to the government. The rule relied on by Victory is not applicable where a principal sues his agent for failing to carry out the terms of an agreement. *See* Klein v. May Stern & Co., 144 Pa.Super. 470, 19 A.2d 566 (1941).

Actually the *Inland* case supports the position of the government in this case. There the court held the agent liable for losses caused by the theft of goods it was required by contract with the government to deliver to Army depots. The goods were stolen by the agent's employees. The contract provided that the agent would be liable for any loss due to the fault of the agent's employees prior to delivery. The agent was held to be liable *under the contract* regardless of the criminal liability of the employees. The same reasoning applies to the instant case.

■ It is well-established that an agent is responsible to his principal for the actions of a sub-agent in handling the affairs of the principal which have been entrusted to the sub-agent. *See* Restatement (Second) of Agency, § 406,

and 406, Comment b. In Klein v. May Stern & Co., *supra,* a collection agent was held liable for the misappropriation by an employee. Until changed by the Uniform Commercial Code, § 4–202, banks were held liable under the common law for the actions of their appointed sub-agents. *See* Streissguth v. National German-Am. Bank, 43 Minn. 50, 44 N.W. 797 (1890); and Exchange Nat'l Bank v. Third Nat'l Bank, 112 U. S. 276, 5 S.Ct. 141, 28 L.Ed. 722 (1884). In the case last cited, the Supreme Court said:

The agreement of the * * * [agent] in this case was to collect the drafts, not merely to transmit them to the Newark bank for collection. This distinction is manifest; and the question presented is whether the New York bank, first receiving these drafts for collection, is responsible for the loss or damage resulting from the default of its Newark agent. * * * The contract, then, becomes one to perform certain duties necessary for the collection of the paper and the protection of the holder. The bank is not merely appointed an attorney, authorized to select other agents to collect the paper. Its undertaking is to do the thing, and not merely to procure it to be done. In such case, the bank is held to agree to answer for any default in the performance of its contract; and, whether the paper is to be collected in the place where the bank is situated, or at a distance, the contract is to use the proper means to collect the paper, and the bank [as agent], by employing subagents to perform a part of what it has contracted to do, becomes responsible to its customer [as principal]. This general principle applies to all who contract to perform a service. * * * [*Id.* at 287–288, 5 S.Ct. at 146–147.]

* * * If the agency is an undertaking to do the business, the original principal may look to the immediate contractor with himself, and is not obliged to look to inferior or distant

under-contractors or subagents, when defaults occur injurious to his interest. [*Id.* at 289, 5 S.Ct. at 147.]

■ Victory says these bank cases are old and that under the present Uniform Commercial Code a collecting bank is liable for the acts of a sub-agent bank only if the collecting bank fails to use "ordinary care in selecting properly qualified intermediary banks and agents and in giving proper instructions to them," citing Uniform Commercial Code, § 4–202, Comment 4. It says this is the modern view and the same reasoning should be applied in the instant case where it alleges it used due care in selecting Compass and that there was no negligence on Victory's part that caused the loss. We do not think the age of the cited cases detracts from their applicability. Nor do we think that the statute which changed the rule as to collecting banks and their sub-agents changed the fundamental principles of common law agency as reflected in the above-cited cases. No statute is involved in this case. The fact that Victory exercised ordinary care in selecting its sub-agent does not exempt it from liability here. *See* Restatement (Second) of Agency, § 5(1), Comment a.

■ Victory says that it is not liable for the loss because of the exculpatory provisions in Articles 5 and 6 of the Agreement. Article 5 provides that the government can deny payment to Victory "for payment of expenses which are found to have been made in wilful contravention of any outstanding instructions or which are found to have been clearly improvident or excessive." It contends that no liability can exist against it except for payments made by it of this character, and that the loss here does not fall in this category.

Article 6 provides that Victory shall not be liable for the failure to perform any service because of any Act of God or any other cause beyond its control. It argues that it should not be liable

here because the dishonest act of Compass' employee was beyond its control.

We do not agree with Victory's argument as to nonliability because of such exculpatory statements. If such a contention prevailed, the effect would be to nullify Article 3(b) and (f) of the contract. The provision of Article 5 does not apply here because the loss was not caused by the payment of any "wilful," "improvident," or "excessive" expenses, or payment for any expenses whatever, for that matter. Article 6 does not apply because Victory did not fail to perform a "service" under the agreement, but failed to perform a duty, namely, to account for funds deposited with it by the government.

■ A contract must be considered as a whole and interpreted so as to harmonize and give meaning to all of its provisions. *See* Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 979, 169 Ct.Cl. 384, 395–396 (1965). Victory's argument is contrary to this principle, as it would eliminate Article 3(b) and 3(f), which were placed in the contract for the protection of the government. On the other hand, a construction and interpretation of the contract consistent with the contentions of the government will harmonize and give effect and meaning to all of the provisions of the contract.

■ We hold that Victory had a plain and unequivocal duty to account for the shortage in government funds in the sum of $49,487 and to pay that amount to the government, and that when it failed to do so the government had the right to draw the draft in that amount against the letter of credit and receive the money. Accordingly, Victory is not entitled to recover.

The motion for summary judgment of the plaintiff is denied and the cross-motion for summary judgment of defendant is granted, and plaintiff's petition is dismissed.