**CORPORACION DE MERCADEO AGRICOLA, Plaintiff-Appellant,**

v.

**MELLON BANK INTERNATIONAL, Defendant-Appellee.**

No. 986, Docket 79–7012.

United States Court of Appeals, Second Circuit.

Argued May 23, 1979.

Decided Oct. 2, 1979.

Herman E. Cooper, New York City (Jonathan L. Sulds, New York City, of counsel), for plaintiff-appellant.

John E. Sprizzo, New York City (Curtis, Mallet-Prevost, Colt & Mosle, New York City, John F. Egan, Matias A. Vega, New York City, of counsel), for defendant-appellee.

Before LUMBARD, MANSFIELD and GURFEIN, Circuit Judges.

LUMBARD, Circuit Judge:

Plaintiff Corporacion de Mercadeo Agricola [CMA] appeals from an order entered by Judge Leval in the Southern District of New York on December 7, 1978 and reported at 464 F.Supp. 88 (S.D.N.Y.1978) dismissing CMA's contract claim against Mellon Bank International [Mellon]. CMA alleged that Mellon unjustifiably refused to honor CMA's draft drawn under Mellon's letter of credit 5171. Mellon moved for summary judgment and showed that CMA failed to tender documentation in conformity with

the specifications contained in the letter of credit. The district court granted Mellon's motion and CMA appealed. We affirm.

This case arises out of dealings between CMA and the Pan American Fruit and Produce Corporation [Pan American]. CMA is a corporation organized under the laws of the Republic of Venezuela as an official government agency engaged in the business of selling Venezuelan agricultural commodities. Pan American is a New York corporation engaged in international trade. The Mellon Bank is a New York corporation as well.

In March, 1974, CMA and Pan American entered into Contract No. 84 which provided that CMA would sell to Pan American approximately 30,000 metric tons of Venezuelan paddy rice at a price of $9,630,000. The ninth paragraph of the contract provided for payment of the purchase price by means of an irrevocable letter of credit. This first letter of credit was to be issued in CMA's favor in the above amount within five days after execution of the contract of sale.

To ensure performance of its contractual obligations, including execution of the first letter of credit as required by paragraph nine, Pan American agreed to provide CMA upon execution of the contract with a guaranty of ten percent of the total purchase price, of $963,000. The contract further provided that this guaranty would become payable "by virtue of the sole fact of non-fulfillment" by Pan American of any of its obligations under the agreement. Accordingly, Pan American purchased from Mellon Bank on March 18, 1974 a second letter of credit (LC 5171) in CMA's favor which provided liquidated damages totalling $963,000 should Pan American default. This second letter of credit obligated Mellon to honor sight drafts drawn by CMA in amounts up to $963,000, when accompanied by:

"Beneficiary's signed statement in duplicate that Pan American Fruit & Produce Corp. did not perform in accordance with contract 084 for the purchase sale of 30,-000 M.T. Paddy Rice in accordance with conditions agreed upon by buyers and sellers. Statement of facts by beneficiary and accountee."

This guaranty was designed to compensate the seller for any losses incurred as the result of the buyer's insolvency or as the result of any other contingency leading to the buyer's default. The letter of credit called for statements from both the buyer and the seller acknowledging the buyer's default, but the contract did not specify any circumstances under which the buyer would be required to issue a statement. However, in the event of default, the seller could have sought a court order requiring the production by the buyer of the necessary statement in order to enforce the good faith intentions of the parties. No such court order was sought here until after the letter of credit expired.

As of April, 1974, Pan American had failed to obtain the first irrevocable letter of credit which was to be used for payment of the purchase price, in violation of paragraph nine of the contract. CMA therefore advised Mellon in late April, 1974 that it planned to exercise its right to obtain liquidated damages under the second letter of credit. Mellon agreed, at Pan American's request, to extend the expiration date of the second letter of credit from April 30, 1974 to June 30, 1974, in order to allow more time for Pan American to cure its default. Pan American, however, failed to cure its default. Accordingly, on June 5, 1974, CMA presented Mellon Bank with a draft on the second letter of credit in the amount of $963,000, accompanied by documents which CMA claims satisfied the requirements of the letter of credit. These documents included:

1.  A document written by one Sr. Valera on April 29, 1974, in which Valera asserts that he is the representative of Pan American and that Pan American has not fulfilled its obligations under the contract;

2.  A copy of Pan American's letter of February 13, 1974, authorizing Valera to sign Contract No. 84 on behalf of Pan American (see infra);

3. A statement by CMA that Pan American had not fulfilled its obligations under the contract; and

4. A copy of Contract No. 84 bearing Valera's signature for Pan American.

Since Valera's authority to sign on behalf of Pan American for payment on the letter of credit is at the center of this controversy, we shall review the nature and extent of that authority in some detail. Pan American engaged Valera, a Venezuelan commodity trader, in early 1974, for the purpose of negotiating the contract with CMA. Accordingly, on February 13, 1974, Pan American sent to CMA the following letter, which delineates the authority granted to Valera:

Gentlemen:

We are pleased to inform you hereby that we have conferred a power of attorney to Mr. Gonzalo Sanchez Valera, Identity Card (Venezuelan) No. 163598, by which he is entitled to sign contracts and represent us and our company before the official and private organizations of the Republic of Venezuela.

Very truly yours,
Pan American Fruit
& Produce Corp.

█ Pursuant to this authorization Valera signed Contract No. 84 on behalf of Pan American. The authority contained in this letter, however, was not general. Rather, Valera was authorized to represent Pan American only before the "official and private organizations of the Republic of Venezuela"—such as CMA. Mellon Bank is neither an official nor a private organization of the Republic of Venezuela. Accordingly, this authority did not include representation of Pan American before Mellon Bank and it did not include any authority to prepare the documents necessary for payment on the letter of credit. CMA does not assert that Valera's authority was ever enlarged beyond the parameters delineated in this February 13, 1974 letter.

That Valera never possessed the authority to prepare and sign the documents necessary for CMA to collect on the letter of credit is further confirmed by the names and signatures which Pan American certified to Mellon in July, 1973 as authorized to represent Pan American in its dealings with Mellon. Pan American certified to Mellon the name and signature of Gilbert D. Heller, Pan American's president, and Loretta Szeliga, its secretary. Valera's name was never on any list of authorized signatures submitted to Mellon.

█ Finally, whatever authority Valera possessed with respect to Pan American was revoked in a notarized document dated March 8, 1974. CMA received this document March 15, 1974—eighty days before CMA attempted to use Valera's signature to collect on the letter of credit. To be sure, CMA seeks to lessen the impact of this revocation notice by arguing that the way in which it was mailed and received rendered it ineffective. CMA argues that Pan American should have sent this letter to CMA's legal department or to the president's office, where its importance would have been recognized. Instead, this letter was received by another bureau of CMA and placed in the general correspondence file, where its significance was not recognized until defendants obtained it through discovery. Notice to the agent, however, is notice to the principal, unless the person giving notice has reason to know that the agent has no duty to or will not transmit the message to the principal. *See generally*, Seavey, Notice Through an Agent, 65 U.Penn.L.Rev. 1 (1916). Since CMA has made no showing that Pan American should have known that the CMA mailroom would not transmit the revocation notice to the proper parties, the general rule applies. Indeed, even without proof of receipt by the addressee, proof that such a letter was sent would be strong evidence of sufficient notice.

When CMA demanded payment on the letter of credit, Valera's lack of authority immediately attracted attention. After reviewing the documents and noting Valera's lack of authority, Mellon Bank checked with Pan American to see if it should nevertheless honor CMA's draft on the basis of Valera's signature. Pan American ad-

vised Mellon that Valera was not authorized to prepare a statement of facts or sign for Pan American and that Mellon should therefore not pay on the draft.

On June 11, 1974, Mellon advised CMA that it would not honor the draft because:

".  .  . Sr. Gonzalo Sanchez Valera is not authorized to sign on behalf of the accountee, Pan American Fruit and Produce Corporation. The accountee informs us the authority which was previously granted to him was revoked prior to the opening of our credit. Consequently, the requirement for a statement of facts by the accountee has not been fulfilled."

CMA never submitted the required statement of facts to Mellon. The letter of credit expired June 30, 1974.

CMA commenced no action seeking injunctive relief against Mellon or Pan American, such as an order requiring Pan American to provide a statement of facts, prior to the June 30, 1974 expiration of the letter of credit. Nor did CMA seek to cure the defect in the original documentation by submitting revised or new documents. Instead, CMA commenced this suit against Mellon on November 26, 1974, seeking damages for breach of contract and alleging that Mellon breached its contract with CMA by failing to pay on the letter of credit. On April 5, 1975, CMA filed a second complaint seeking equitable relief in the form of an order directing Pan American to deliver a proper statement of facts to Mellon or adjudging Mellon *nunc pro tunc* to have received a proper statement of facts.

Pan American moved for dismissal of the second action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Treating the motion as one for summary judgment, Judge Cannella of the Southern District of New York ordered dismissal as to Pan American on April 21, 1976, on the ground that it was by then too late to compel Pan American to provide a statement of facts. CMA has not appealed that ruling. On the same day, Judge Cannella also granted CMA's cross-motion for consolidation.

On July 8, 1976, Mellon moved for summary judgment, on the ground that Valera was not authorized to sign for Pan American and that the refusal to pay on the letter of credit was therefore proper. On May 10, 1977, Judge Cannella denied Mellon's motion in a two-sentence order on the ground that there were disputed factual issues regarding the effectiveness of Pan American's alleged revocation of Valera's authority and the parties' knowledge of that purported revocation.

After additional discovery, Mellon again moved for summary judgment, asserting that further discovery made such a motion proper once again. That same day, without request by the parties, the action was transferred to Judge Leval. There ensued several pretrial conferences with Judge Leval, who raised additional issues and afforded the parties the opportunity to respond to these issues with supplemental briefs and affidavits. Judge Leval granted Mellon's motion for summary judgment on December 6, 1978.

Judge Leval granted Mellon's motion for summary judgment for two reasons. First, since a power which is neither stated to be revocable nor coupled with an interest is revocable at will, he concluded that Mellon could not be required to honor a statement by a representative without fresh confirmation of that representative's authority. Second, Judge Leval concluded that Valera's original authorization did not include any authority "to make on behalf of Pan American a statement to its banker amounting to a confession of liability authorizing payment of an indemnity of nearly a million dollars." Since it is black letter law that the terms and conditions of a letter of credit must be strictly adhered to, *see, e. g., Bounty Trading Corp. v. S. E. K. Sportswear*, 48 A.D.2d 811, 370 N.Y.S.2d 4 (1st Dept. 1975), Judge Leval concluded that Mellon had followed the only proper course available in refusing payment.[1]

---

1. Judge Leval's conclusion with respect to the propriety of Mellon's refusal to honor CMA's draft on the letter of credit tracks Judge Cannella's conclusions on the same issue when he

■ On appeal, CMA argues that Judge Cannella's denial of Mellon's first motion for summary judgment became the law of the case barring Judge Leval from later granting a similar motion. In *Dictograph Products Company v. Sonotone Corporation*, 230 F.2d 131 (2d Cir. 1956), we set forth the standard which governs consideration of such a motion. We held that on a renewed motion for summary judgment before a second judge, the district court must balance the need for finality against the forcefulness of any new evidence and the demands of justice. With respect to a non-appealable denial of summary judgment, the law of the case is not a limit on the court's jurisdiction, but a rule of practice which may be departed from in the sound discretion of the district court. The first judge always has the power to change a ruling; further reflection may allow a better informed ruling in accordance with the conscience of the court. *A fortiori*, if the first judge can change his mind after denying summary judgment, and change his ruling, a second judge should have and does have the power to do so as well.

■ CMA also contends that Judge Leval reached out to decide an issue not tendered by the parties—the need to confirm Valera's authority—and that this error requires reversal under *FLLI Moretti Cereali v. Continental Grain Co.*, 563 F.2d 563 (2d Cir. 1977). In *FLLI Moretti Cereali*, the district court granted summary judgment on the basis of its determination of an issue which was not raised in the statement of facts.

Since the defendant was as a result prevented from introducing evidence relevant to that issue, this court reversed the grant of summary judgment. Here there has been no denial of the right to be heard on any issue. Although Judge Leval himself raised the legal issue of the need to confirm Valera's authority, he heard from both parties orally and in writing on this point, as CMA concedes in its brief. In addition, Judge Leval did not introduce an entirely new issue, as occurred in *FLLI Cereali Moretti*. Judge Leval directed attention to a different facet of the one issue which has been central to this case from the moment it was filed: the nature and extent of Valera's authority. With the outcome of the dispute dependent upon this one question, CMA can hardly claim surprise because Judge Leval probed somewhat deeper than did either of the parties.

■ CMA also argues that when Mellon referred to Pan American's revocation of Valera's authority in refusing to honor the draft on the letter of credit, Mellon thereby waived all other defenses, including a defense based on Valera's complete lack of authority at all times. We think this too narrow a construction of the authority issue. To be sure, when a bank offers one reason for refusing a draft on a letter of credit, and that reason is later refuted, it cannot at trial point to an entirely different reason for sustaining the refusal. Otherwise, a bank could surprise the beneficiary of a letter of credit with a defense which

---

granted Pan American's motion to dismiss on April 21, 1976. In his opinion, Judge Cannella had written:

"A bank's obligation in a letter of credit transaction is defined by the contract between the bank and its customer. It is obliged to pay only if the documents submitted strictly comply with the essential requirements of the letter of credit. *E. g., Fair Pavilions, Inc. v. First Nat'l City Bank*, 19 N.Y.2d 512, 281 N.Y.S.2d 23, 227 N.E.2d 839 (1967); *Anglo-South American Trust Co. v. Uhe*, 261 N.Y. 150, 184 N.E. 741 (1933); *Ufitec, S. A. v. Trade Bank and Trust Co.*, 21 A.D.2d 187, 249 N.Y.S.2d 557 (1st Dept. 1964), *aff'd*, 16 N.Y.2d 698, 261 N.Y.S.2d 893, 209 N.E.2d 551 (1965). *Accord, Sisalcords Do Brazil, Ltd. v. Fiacao Brasileira De Sisal,*

*S.A.*, 450 F.2d 419 (5th Cir. 1971), *cert. denied*, 406 U.S. 919 [92 S.Ct. 1771, 32 L.Ed.2d 118] (1972); *Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461 (2d Cir. 1970). Here Mellon obligated itself to honor plaintiff's drafts against the letter of credit until June 30, 1974. When Mellon did not receive the proper documents prior to that date, whether due to its customer's wrongful acts or otherwise, its obligation to pay terminated. Whatever rights plaintiff may now have against Pan American for its alleged wrongful refusal to submit a statement of facts, they do not include an enlargement of Mellon's obligations under the letter of credit, absent some wrongful act on its part. Any other result would have serious ramifications throughout the banking community."

might have been cured earlier. *See, e. g., Maurice O'Meara v. National Park Bank,* 239 N.Y. 386, 397, 146 N.E. 636. But where, as here, a bank offers a reason for refusing a draft on a letter of credit which fairly places into issue an agent's authority so that there can be no question of the proper cure and no surprise at trial, there is no reason to construe the bank's action as waiving the authority defense. Although Mellon's statement of refusal mentioned the revocation of Valera's authority, mere mention of the revocation did not necessarily mean that Mellon was henceforth conceding that Valera would otherwise have possessed full authority.

CMA next argues that the grant of summary judgment was error because it necessarily required that Judge Leval resolve issues of disputed fact. CMA contends that Judge Leval's finding that Valera's authority was stale, entitling Mellon to refuse to honor the draft on the letter of credit in the absence of a fresh confirmation of authority, required resolution of disputed claims of fact and was therefore a matter for trial.

We need not decide whether Judge Leval was correct in holding that Valera's authority was stale under the circumstances obtaining here. Judge Leval also held that Valera's original authorization, as documented, did not include any authority to sign a statement of facts for the letter of credit. Valera's authority, as documented, was a question of law. We have reviewed the relevant documents, which are unambiguous, and we agree that Valera never had the requisite authority. Accordingly, we affirm the grant of summary judgment on this ground.

▪ CMA also claims that Judge Leval should not have granted summary judgment because whether Mellon acted in good faith in denying the draft is a factual matter which can only be resolved at trial. But Mellon's good faith is not a relevant issue on this record. The contract among the parties required that Mellon pay on the letter of credit only after CMA presented conforming documents. CMA never presented conforming documents. Accord-

ingly, Mellon was never obligated to pay on the draft and the question of good faith does not arise. *See, è. g., Key Appliance, Inc. v. First National City Bank,* 37 N.Y.2d 826, 377 N.Y.S.2d 482, 339 N.E.2d 888 (1975); *AMF Head Sports Wear, Inc. v. Ray Scott's All-American Sports Club, Inc.,* 448 F.Supp. 222, 224 (D.Ariz.1978) ("Dishonor of a demand for payment when the demand does not comply with the terms of the letter of credit cannot constitute bad faith").

▪ Finally, CMA contends that if its legal arguments fail, this court should nevertheless issue an equitable *nunc pro tunc* order either adjudging Mellon to have received a proper statement of facts or directing Pan American to deliver a proper statement of facts. But since Mellon has not been shown guilty of any wrongdoing or bad faith, and its legal obligations under the letter of credit have expired, there is no basis for awarding an equitable decree. CMA, moreover, has not been without a remedy at law. Rather, CMA has slept on whatever rights it has. Once the letter of credit expired, CMA's proper remedy was to sue Pan American directly, a remedy which CMA has not chosen to pursue.

There can be no doubt, as our Brother Gurfein so persuasively points out, that the terms of the letter of credit accepted by CMA proved to be unfortunate for it because they required it, before payment could be made, to present to Mellon a "statement of facts", signed by CMA and Pan American, with respect to Pan American's failure to perform its obligations under the rice-purchase contract "in accordance with conditions agreed upon by buyers and sellers". We find nothing ambiguous about this plain requirement, which was clearly intended to protect the bank against becoming involved in any dispute that might develop between the beneficiary and accountee over whether the underlying conditions had been met.

CMA, presumably a sophisticated business organization, had been put on notice by the plain language of the letter of credit and by the express written limitation on Valera's authority, which was restricted to

representation before organizations of the Republic of Venezuela and did not extend to the letter of credit, that it would have to rely upon Pan American to join in any statement of default if that should become necessary. This reliance turns out to have been misplaced. However, CMA's predicament is not attributable to Mellon but to Pan American. Thus CMA failed to avoid the harm to it by negotiating a more advantageous letter of credit in the first place or by seeking relief against Pan American before the letter of credit expired.

Under the circumstances, it is hardly appropriate for a federal court to supply the protection which CMA thought it had at the expense of the Mellon Bank which was within its rights in strictly construing the agreement. Any claims CMA may have as a result of its bad bargain lie against Pan American, not against the bank.

Affirmed.

GURFEIN, *Circuit Judge, dissenting:*

The New York Court of Appeals in *Fair Pavilions, Inc. v. First National City Bank*, 19 N.Y.2d 512, 518, 281 N.Y.S.2d 23, 27, 227 N.E.2d 839, 842 (1967), said that if a clause of a standby letter of credit were construed so as to "place one party at the mercy of another," it "is against the general policy of the law." I agree. That court also noted that when the bank had neither collateral nor a customer financially able to respond, it was "defending in its own interest." *Id.*

at 516, 281 N.Y.S.2d 23, 227 N.E.2d 839. This would put in issue the bank's good faith in refusing to pay the beneficiary under the letter of credit.

Here the bank was asked to give a "guarantee" to the Venezuelan seller, CMA, of a particular contract numbered 084 for the purchase of $9 million worth of rice. What it gave was a purported standby letter of credit under which, according to the interpretation of my brothers, the buyer was able without reason to veto the payment by simply failing to provide a "statement of facts."

It is true that standby letters of credit are now used not only to pay when there is performance but also to pay up when there is default in performance. I do not doubt that a letter of credit may be used to provide credit in lieu of a cash deposit against the contingency of default. In such case I think that what should be required is a simple notice from the beneficiary that the stipulated default has occurred or some objective statement of a third party of the event of default.[1] Otherwise what passes for cash has no resemblance to cash. The issuer bank should know precisely what the documents are that it requires to be presented without cavil or controversy. The beneficiary should know that it will be paid if default should occur without gloss or independent review by an issuer who may, by then, not be eager to pay up. That is

---

1. *See, e. g., Barclays Bank D.C.O. v. Mercantile National Bank*, 481 F.2d 1224, 1228 n.5 (5th Cir. 1973), *cert. dismissed*, 414 U.S. 1139, 94 S.Ct. 888, 39 L.Ed.2d 96 (1974); *Victory Carriers, Inc. v. United States*, 467 F.2d 1334, 1339, 199 Ct.Cl. 410 (1972); *Intraworld Industries, Inc. v. Girard Trust Bank*, 461 Pa. 343, 336 A.2d 316, 319–20 n.7 (1975); *American Empire Ins. Co. v. Hanover National Bank of Wilkes-Barre*, 409 F.Supp. 459, 461 n.1 (M.D.Pa.1976); *Dynamics Corp. of America v. Citizens and Southern National Bank*, 356 F.Supp. 991, 994 n.2 (N.D.Ga.1973). And *see* illustrations in B. Kozolchyk, Commercial Letters of Credit in the Americas, § 1.02[3] at 24–25 (1966). In a standby letter of credit "the required document is usually nothing more than a certificate created by the beneficiary." Jack B. Justice, *Letters of Credit: Expectations and Frustrations—Part I*, 94 Banking L.J. 424, 429 (1977).

While a letter of credit must conform to the specifications of the bank's customer, there is no law that compels a bank to issue such an ambiguous or illusory document. Indeed, paragraph "d" of the UCP's General Provisions and Definitions provides: "Credit instructions and the credits themselves must be complete and precise and, in order to guard against confusion and misunderstanding, issuing banks should discourage any attempt by the applicant for the credit to include excessive detail." Henry Harfield adds: "This word of caution should be amplified in its application to 'guaranty credits' and their ilk."—a prophetic insight. Harfield, *Code, Customs and Conscience in Letter of Credit Law*, 4 U.C.C.L.J. 7, 15 (1971).

presumably why the UCP provides that a bank "must determine, *on the basis of the documents alone*, whether to claim that payment, acceptance or negotiation was not effected in accordance with the terms and conditions of the credit." UCP Article 8 (emphasis added). As a commentator has noted:

The financial value of the letter of credit promise is predicated upon its degree of legal certainty.

B. Kozolchyk, *supra* n.1, § 18.04[1] at 394–95.

In issuing a letter of credit allowing a veto by its customer, the bank took neither collateral from its customer, Pan American, nor even a personal indemnity from Pan American's principal. It has been asserted by affidavit on the summary judgment motion that Pan American had only two officers and employees, no apparent credit line except from Mellon, no visible capital, consequential resources or active accounts, and was operated from the office of its lawyer. We must take these assertions as unrebutted for purposes of summary judgment. In sum, when payment on the letter of credit was demanded, the bank was "defending in its own interest."

That a hoax was perpetrated on CMA is obvious. It was led to believe that it had the guaranty of an American bank when, in fact, it had nothing, according to the majority.

Specifically Irrevocable Letter of Credit 5171 made $963,000 available to CMA until April 30, 1974 against its sight draft accompanied by the following documents:

*Beneficiary's* signed statement in duplicate that Pan American Fruit & Produce Corp. did not perform in accordance with contract 084 for the purchase/sale of 30,000 M.T. Paddy Rice in accordance with conditions agreed upon by buyers & sellers. *Statement of facts* by beneficiary and accountee.

(Emphasis added.)

There is no explanation of what "statement of facts" means. It does not require, in terms, an admission of default by the accountee but simply its version of "the facts" whatever they may be.

On March 8, 1974 the contract for sale of paddy rice was approved by CMA and signed the same day by Sr. Gonzalo Sanchez Valera as agent for Pan American. *On the very same day*, March 8, as it was made to appear later, Pan American purported to revoke Valera's agency.

Though it is now contended that Valera's agency was revoked effectively on March 8, CMA was permitted *on March 13* to countersign the very contract which Valera had signed on behalf of Pan American. Contract 084 explicitly refers to Valera as the authorized signatory for Pan American as the record shows.

*Contract 084 required an irrevocable letter of credit for the full purchase price to be posted within five days of the signing of the contract.* Since the bank was purporting to indemnify CMA for a failure of performance of a particular contract, 084, we may assume, on a motion for summary judgment, that it had a copy of the contract which would show Valera as the signatory on behalf of CMA. Thus Valera's agency was in place, together with his signature, so far as Mellon was concerned. Pan American failed to furnish the required letter of credit.

On June 5, 1974 Banco La Guaria Internacional, designated by Mellon as its advising bank, wrote to Mellon requesting payment and enclosing:

1. Sight draft for U.S. $963,000.00.

2. Statement from CMA evidencing that Pan American has not complied with the requirements of the Contract guaranteed by said Letter of Credit.

3. Statement from Valera evidencing that his principal has not complied with the clauses of Contract No. 084.

4. Photocopy duly legalized of the document by which Pan American confers

a power of attorney on Mr. Gonzalo Sanchez Valera.[2]

5. Photostat of the relative contract.[3]

On June 11 Mellon rejected the documents and dishonored the draft assigning as its sole reason that its customer had informed it that the agency had been revoked even before CMA had signed Contract 084. Mellon did *not* assert that the agency power furnished to it was insufficient on its face to permit the agent to give the "statement of facts" required. Let us look at this agency.

The power of attorney on its face gave Valera power not only to sign contracts on behalf of Pan American but also to "represent us and our company [Pan American] before the official and private organizations of the Republic of Venezuela." There was no express limitation on the scope of his authority to "represent" Pan American before CMA. And it was CMA which was to present a document containing a "statement of facts" to accompany its draft on Mellon. When on April 29 Valera appeared before the legal department of CMA he was asked to submit an affidavit confirming Pan American's default in failing to provide the irrevocable letter of credit for the full purchase price.

Instead, Valera called Heller, the principal in Pan American, who told Valera to request CMA to be patient and not to take any action with regard to the initial letter of credit furnished as a guaranty with the assurance that the letter of credit covering the purchase price in the sum of U.S. $9,630,000 would be opened within the following ten days.

Valera informed CMA, still as agent for Pan American pursuant to its direction, that the expiration date of the standby letter of credit would be extended past April 30 so that CMA would not be prejudiced by the short delay. Accordingly, Valera submitted an affidavit to CMA on April

29, 1974 simply "indicating that Pan American had failed to comply with Contract 084 as a declaration of fact" (141a). The trier of fact could find that Valera was acting as agent in both situations when *on the same day* at the end of April he procured an extension for Pan American and acknowledged also that it was in actual default, and thus the trier could find that his agency extended beyond March 8, the alleged date of revocation. Valera had not been informed that his agency had allegedly been revoked the day he signed the contract, nor was it brought home to the negotiating persons in CMA; and Valera was still being used as agent by Pan American after March 8.

In spite of the rule of the International Chamber of Commerce that the issuer of a letter of credit may not go outside the documents presented, UCP Article 8, Mellon did just that, and one may wonder whether that was not simply because Mellon was "defending in its own interest." That suspicion is strengthened by the circumstance that, already having gone beyond the documents, the bank then failed to ask Pan American the natural question whether it, as principal, intended to supply the "statement of facts" required to CMA if Valera no longer had the power to do so as its agent.

I suppose that the essence of my disagreement with the majority is its contention that CMA relied on the "good faith" of the buyer since "the contract did not specify any circumstances under which the buyer would be required to issue a statement." In point of fact, the seller did not know the buyer, refused to rely on its credit or good faith and requested a guaranty. It apparently did know Valera, the appointed agent. Moreover, the suggestion that the beneficiary could have sued the buyer to compel him to file a paper with the bank is so

---

**2.** This document reads as follows:

Gentlemen:

We are pleased to inform you hereby that we have conferred a power of attorney to Mr. Gonzalo Sanchez Valera, Identity Card (Venezuelan) No. 163598, by which he is entitled to sign contracts and represent us and our

company before the official and private organizations of the Republic of Venezuela.

Very truly yours,
Pan American Fruit
& Produce Corp.

**3.** The photostat, presumably, had the signature of Valera on it.

contrary to the simple pattern of letter of credit law that the suggestion, even if it were practical, has serious overtones that are undesirable. With the speed essential to letters of credit one would hardly suppose that an instrument contemplating court action for its effectiveness is a true letter of credit.

Though I have no desire to change the austere nature of letter of credit law, I believe that Mellon, in this case, has issued such an unusual letter of credit that the language must be construed against it. If, as I believe, the letter of credit was, in the spirit of *Fair Pavilions, supra,* against public policy, and even more so because it was permitted to be used in a flim-flam game in international trade, the question is what to do about it.

One cannot strike it down entirely, for that would disadvantage the beneficiary who did not write it. This leaves us with the choice (1) of so interpreting it that it will not allow an absolute veto by the buyer, or (2) of holding that it is not a true letter of credit at all but is rather a guaranty.

There is precedent in this court for a fair construction of the meaning of "statement of facts" so as to justify interpreting the phrase against the bank. As Judge J. Joseph Smith wrote in *Venizelos, S.A. v. Chase Manhattan Bank,* 425 F.2d 461, 466 (2d Cir. 1970):

> Where a letter of credit is fairly susceptible of two constructions, one of which makes it fair, customary and one which prudent men would naturally enter into, while the other makes it inequitable, the former interpretation must be preferred to the latter, and a construction rendering the contract possible of performance will be preferred to one which renders its performance impossible or meaningless. See *Liberty Nat'l Bank & Trust Co. v. Bank of American Nat'l Trust & Savings Ass'n,* 218 F.2d 831, 840 (10 Cir. 1955). Moreover, as between the beneficiary of a letter of credit and the issuer (or in this case, Chase, since confirmers are to be treated as issuers under New York com-

mercial law) if ambiguity exists, the words are taken as strongly against the issuer as a reasonable reading will justify. *Lamborn v. National Park Bank of New York,* 212 App.Div. 25, 208 N.Y.S. 428 (1925), aff'd 240 N.Y. 520, 148 N.E. 664.

I would take the words "statement of facts" "as strongly against the issuer as a reasonable reading will justify." *Id.* Such a reading would be that "statement of facts" means what it says—that it requires simply a statement of what had occurred and not a confession of default. Valera's authority was abundant on its face to give such a factual statement to CMA, for he was entitled to "represent" Pan American before CMA. When CMA obtained the document from Valera, the agent of Pan American, it had the right to present it to the bank as an accompanying document to the draft, for it was CMA, the beneficiary, and not Pan American which was to present the documents to the bank. In the circumstances there was nothing on the papers to indicate in the slightest degree that Valera's agency had been revoked, and the bank under familiar letter of credit law was not permitted to inquire beyond the face of the documents. Thus, under this first approach, the bank is clearly not entitled to summary judgment.

A fair alternative is to hold that to give an absolute veto to the person on whose behalf the standby letter of credit was given, even though he concededly failed to perform, is so contrary to the conventional letter of credit usage that the paper loses the benefit of the strict rules applicable to letters of credit. The theory that a letter of credit is treated in law differently from a guaranty is simple enough—that it is a separate contract *between issuer and beneficiary* to which the person whose performance is guaranteed is not a party. But when that person has the power of arbitrary veto, the instrument is a trilateral rather than a bilateral instrument and is more like a guaranty than like the conventional standby letter of credit to which we have become accustomed in the past few decades, along with its tight rules.

Moreover, the phrase "statement of facts" is on its face ambiguous. Does it require a "statement of facts" from the accountee *agreeing* with the statement of the beneficiary? Could the accountee provide its own "statement of facts" *disagreeing* with the statement of the beneficiary?[4] What would happen then? It is possible to argue that each differing version of "the facts" would have to be examined by the bank and a decision made whether the beneficiary or the accountee was right.

Yet that is hardly the duty or the prerogative of a bank which issues a letter of credit. And that is another reason why this is not a letter of credit in the conventional sense. Once the issuer bank has to look outside the documents tendered or to meet its obligations to the beneficiary only upon the sufferance of the defaulter, the document, no matter how labeled, is not a letter of credit.

There is precedent for treating a paper which on its face purports to be a "letter of credit" as a guaranty. *Wichita Eagle and Beacon Pub. Co., Inc. v. Pacific National Bank of San Francisco*, 493 F.2d 1285 (9th Cir. 1974). The bank had issued a "letter of credit" requiring payment to a lessor upon default in the construction of a parking garage by the lessee. In holding that the agreement, though called a "letter of credit" on its face, was a guaranty rather than a valid letter of credit, the Ninth Circuit emphasized that the agreement did not require payment upon mere presentation of documents, that it suffered from "loose terms" [cf. "statement of facts"], and that the lessee was authorized to terminate the agreement merely upon representing to the bank that the lessee had been refused a building permit. The control by the customer, the ambiguity, and the examination by the issuer of facts not contained in the documents themselves were significant in *Wichita Eagle* as they are here. In that case, the Ninth Circuit ultimately held for the beneficiary after treating the "letter of credit" as a guaranty.

I would adopt the rationale of the Ninth Circuit which stated:

It would hamper rather than advance the extension of the letter of credit concept to new situations if an instrument such as this were held to be a letter of credit. The loose terms of this instrument invited the very evil that letters of credit are meant to avoid—protracted, expensive litigation. If the letter of credit concept is to have value in new situations, the instrument must be tightly drawn to strictly and clearly limit the responsibility of the issuer.

*Id.* at 1286–87.

The stricture is even more apposite in the present case, for this document may well have become an instrument of fraud. What the Venezuelans reasonably took to be a bank guaranty was simply a device that enabled Pan American to peddle its contract in the market without fear of consequence.

If we view this agreement as a guaranty, establishment of the failure to supply the irrevocable letter of credit for the full purchase price would make the bank liable. Its liability for the total amount might be subject, however, to a defense that the provision for liquidated damages was, in the circumstances, a penalty or to such other defenses as may be available to a guarantor of performance.

The affirmance of the summary judgment, in my view, diminishes the reputation of the American banking community in international trade. If a foreign business cannot rely on a bank guaranty through a "letter of credit" when, *though default has occurred*, it is denied recovery without trial in American courts, the American image is tarnished. "American credibility in foreign communities" is injured. *See KMW International v. Chase Manhattan Bank*, 606 F.2d 10, 17 (2d Cir. 1979).

I have deep respect for the sophistication in financial matters of my brothers. I am particularly reluctant, nevertheless, to subscribe to such an unfortunate result since it will only serve, I am afraid, to encourage

---

4. Asserting, for instance, that an oral extension of time had been granted by the beneficiary.

continued loose practice in the future, perhaps to the detriment of the American competitive position in world banking.

I would reverse this summary judgment and remand for further proceedings.